[Civ. No. 47673. Second Dist., Div. Three. June 30, 1976.]

DIAMOND BAR DEVELOPMENT CORPORATION et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LOUIS A. CECCHINI, JR., et al., Real Parties in Interest.

COUNSEL

Cox, Castle, Nicholson & Weekes and Lawrence Teplin for Petitioners.

No appearance for Respondent.

Allard, Shelton & O'Connor and Thomas Brayton for Real Parties in Interest.

OPINION

**COBEY, Acting P. J.**—Petitioners, Transamerica Development Company and its wholly owned subsidiary Diamond Bar Development Corporation, seek a writ of mandate commanding respondent Superior

Court of Los Angeles County to vacate its order of November 26, 1975, denying petitioners' motion for partial summary judgment and instead to grant the motion.[1]

Petitioners assert that there are no triable issues of fact in the third cause of action in the proceeding below and that therefore the trial court's denial of their motion for partial summary judgment was in error. (Code Civ. Proc., § 437c.)

■ A writ of mandate will issue when a trial court erroneously refuses to grant a motion for summary judgment. (See *Burke Concrete Accessories, Inc.* v. *Superior Court,* 8 Cal.App.3d 773, 775 [87 Cal.Rptr. 619].) We have concluded that petitioners are correct in their assertion of the absence of triable issues of fact and, further, that the controversy between petitioners and the real parties in interest should be resolved in favor of the former.

FACTS

Petitioners are the developers of a residential subdivision in Los Angeles County called "The Country." The real parties in interest are some of the owners of lots in The Country. At the inception of the development, petitioners, through their counsel, drafted and recorded a document entitled "First Amended Declaration of Protective Covenants, Conditions, Restrictions and Reservations" (hereinafter referred to as the "CC&R's") affecting all lots in The Country.

■ The CC&R's contain a provision for amendment (art. IX, § 2), the interpretation of which is the subject of the current controversy. It reads as follows:

"*Section 2. Modification or Termination*

"Modification or termination of all or any of the covenants, conditions or restrictions herein may be effected from time to time as to said property or any portion thereof by written instrument duly executed by not less than 70% of the then owners, including vendees under installment sale contracts, of property then covered by this Declaration . . . ."

---

[1]Petitioners earlier sought a writ of mandate in this court. It was denied on January 26, 1976. Subsequently, the Supreme Court granted their petition and ordered the matter transferred to this court with the direction that we issue an alternative writ of mandate.

In article II of the CC&R's, "owner" is defined: "The record owner, whether one or more persons or entities, of a fee simple title to any lot which is a part of [The Country] . . . ."

In April 1975, the board of directors of the Diamond Bar Country Estates Association (the nonprofit corporation, the members of which own lots in The Country; hereinafter called "the Association") voted to submit to the Association at its annual meeting the question of whether certain amendments should be made in the CC&R's with regard to required perimeter fencing around each lot. (Art. III, § 3.) In September 1975, 275 owners of lots executed and recorded instruments indicating their consent to the recommended amendment. Included in this number was Diamond Bar Development Corporation, which owned a total of 270 lots. The real parties in interest were among the remaining 171 property owners who declined to give their consent.

## CONTENTIONS OF THE PARTIES

Petitioners contend that article IX, section 2 of the CC&R's should be construed to mean that an amendment is valid if owners of 70 percent of The Country's lots record consenting instruments. Under this interpretation, the September amendment is valid, as it was consented to by persons owning more than 70 percent of the real property in The Country.[2]

Real parties in interest contend that article IX, section 2 must be construed to mean that an amendment is valid only when at least 70 percent of those owning lots in The Country consent thereto. Under such an interpretation, the September amendment is invalid in that only about 62 percent of the owners manifested their consent.[3]

## DISCUSSION

A. *Applicable Law*

Petitioners and the real parties in interest are in agreement as to what rules govern our interpretation of the CC&R's. The language of any

[2]There are 718 lots in the development. At the time the amendment was proposed, petitioner Diamond Bar Development Corporation owned 270 lots or 38 percent. Remaining assenting property owners possessed 277 lots or about 39 percent.

[3]In September 1975, exclusive of the Diamond Bar Development Corporation, there were 445 "owners" of property in The Country, as that term is defined in the CC&R's. Only 275 or 62 percent of these owners consented to the proposed amendment.

document will govern its interpretation if that language is clear, explicit, and not absurd. (Civ. Code, § 1638.) The whole of a contract is to be considered in interpreting each clause if that is reasonably practicable. (Civ. Code, § 1641.) While the interpretation of any document involves a determination of the intent of those who created it (*Harris* v. *Klure,* 205 Cal.App.2d 574, 577-578 [23 Cal.Rptr. 313]), any uncertain language in an instrument will be interpreted against the one who caused the uncertainty to exist. (Civ. Code, § 1654.)

## B. *The Purpose of the CC&R's*

The CC&R's introductory clause provides us with an idea of its overall purpose. It is a general plan for the protection, maintenance, improvement and development of the total property. Its covenants, restrictions and conditions exist for the benefit of present and future property owners. (See 1 Ogden's Revised Cal. Real Property Law (1974), Planned Development, § 16.5, pp. 677-678.) It is also evident that, at least insofar as amendments to the CC&R's are concerned, petitioners' draftsman intended that minority property owners be protected from the preferences of a bare majority of property owners.

The question before us is whether the draftsman feared a majority tyranny based upon sheer numbers of property owners or a majority tyranny based upon extent of ownership. The declarations submitted by petitioners are not particularly helpful in establishing intent and purpose. They were drafted for this litigation by the vice president of Diamond Bar Development Corporation and by its counsel at the time the CC&R's were drafted; thus they are predictably self-serving.

## C. *Significance of the Association Voting Scheme*

Real parties in interest rely primarily upon the fact that elsewhere in the CC&R's the same draftsman provided for a voting system which explicitly bases voting strength on the numbers of lots owned by each individual. Within article X, section 2(g), an article dealing with the formation and operation of the Association, the following appears: "The Association shall have only one class of voting membership. Members shall be entitled to one vote for each lot in which they hold the interest required for membership."

Real parties argue that if petitioners' interpretation of the amendment procedure were that of the draftsman, he would have used the same detailed language he used in that which has been just quoted.

Petitioners respond that this apparent conflict between the amendment procedure and the Association voting procedure is explained by the fact that the former deals with instruments designed to amend a recorded document while the latter is concerned with the mechanics of actual voting. We find this distinction persuasive. Article IX, section 2 establishes a ratification procedure after an amendment to the CC&R's is proposed. Such an amendment, if duly adopted and recorded, operates as a new condition, covenant or restraint upon the use and enjoyment of all property subject to it. (See *Sharp* v. *Quinn*, 214 Cal. 194, 197 [4 P.2d 942, 78 A.L.R. 501].) The provision for amending the CC&R's does not concern or even mention voting but rather deals with the execution of instruments which announce the willingness of an owner to subject his or her described parcel to the changed condition.[4]

We are satisfied that petitioners' interpretation of their CC&R's is the more sensible. Were the viewpoint of the real parties to prevail, a purchaser of a lot in The Country who wished to determine the validity of an amendment to the CC&R's would have to discover how many persons owned lots at the time the amendment was purportedly adopted. This number is subject to continual fluctuation. Under the interpretation of the CC&R's which we have adopted, any amendment, whenever proposed, will become binding only if approved by the owners of 503 lots (i.e., 70 percent of 718 lots). It is also difficult to believe that petitioners, as the developers of The Country, would have intended that as soon as they had sold only three lots, the CC&R's could be drastically amended despite the opposition of the entities which had by far the greatest economic interest in the project.[5]

[4]In this connection, it is important to point out that the CC&R's define an owner not as an individual or a group of individuals but as the record owner "of a fee simple title to *any lot*" (italics added). Thus one person can be many "owners" within the meaning of the CC&R's.

[5]California Administrative Code, title 10, section 2792.24, although enacted in January 1976, also suggests that petitioners' interpretation is correct. The section provides that it is a "reasonable arrangement" for CC&R's to allow amendment by certain majorities of property owners' association members "other than the subdivider." (Even real parties in interest do not claim that The Country's CC&R's purport to *exclude* the developer from the amendment process.) By specifically permitting developer exclusion as an option, however, section 2794.24 suggests that such a mechanism is unusual and is to be clearly indicated when chosen.

Section 2794.24 also provides that amendment voting is to be accomplished in percentages of the "voting power" of the property owners' association. This is a reflection of the ordinary expectation that the allocation of voting strength will be the same in the amendment procedure as it is in the operation of the property owners' association. (See also Cal. Admin. Code, tit. 10, § 2792.18 (property owners' associations with one class of voters *must* permit one vote for each subdivision interest owned).)

Nor does this argument redound solely to the benefit of petitioners. The majority of The Country's lots remain unimproved, and we can safely assume that some of them are being held for speculative gain. It is entirely likely that investors might purchase more than one lot in The Country and would reasonably expect their ability to influence CC&R's amendments to be commensurate with the extent of their investment. This expectation can only be encouraged by the fact that the Association, which only carries out the provisions of the CC&R's, clearly allocates voting strength on the basis of the extent of property owned.

We conclude that article IX, section 2 of the CC&R's permits amendments if consented to by persons owning at least 70 percent of the lots in The Country. Therefore, petitioners' motion for partial summary judgment should have been granted.

## DISPOSITION

Let a writ of mandate issue directing respondent court to vacate its present order denying summary judgment in favor of defendants upon their third cause of action in action number EAC 19673, and instead to grant such judgment.

Allport, J., and Potter, J., concurred.