**BUEHNER BLOCK COMPANY, a Utah corporation, Plaintiff,**

**v.**

**UWC ASSOCIATES, a Utah limited partnership, Utah Women's Clinic, Inc., Wayne R. Newton, Grant P. Bagley, Stangl Money Plaza II, a limited partnership, and CS & G Masonry, Defendants.**

**UWC ASSOCIATES, a Utah limited partnership, Utah Women's Clinic, Inc., a Utah corporation, as general partner of and on behalf of UWC Associates, Grant P. Bagley, Wayne R. Newton, and F.C. Stangl III, Third–Party Plaintiffs and Appellants,**

**v.**

**HOME SAVINGS AND LOAN, Third–Party Defendant and Respondent.**

No. 19608.

Supreme Court of Utah.

March 21, 1988.

Bruce A. Maak, Salt Lake City, for UWC Associates, Utah Women's Clinic, Inc., Wayne R. Newton, Grant P. Bagley, F.C. Stangl III, Stangl Money Plaza II, and CS & G Masonry.

Thomas A. Duffin, Salt Lake City, for Buehner Block Co.

Verden E. Bettilyon, John T. Kesler, Salt Lake City, for Home Sav. and Loan.

HALL, Chief Justice:

Buehner Block Co. (Buehner) initiated this action against defendants. Its complaint alleged, in pertinent part, that Buehner had furnished defendant CS & G Masonry, a subcontractor, materials to be used in constructing a building owned by the remaining defendants, that Buehner had not been paid for the materials, and that because the defendant owners had not required that a construction bond be obtained pursuant to Utah Code Ann. § 14–2–1 (Supp.1983) (repealed 1987), those defendants were liable to Buehner for the value of the furnished materials.[1] Following a June 1983 hearing, the trial court entered an order concluding that UWC Associates (UWC) was liable to Buehner for the materials, together with interest and costs. The propriety of that order is not at issue.

Appellants impleaded Home Savings and Loan (Home), the institution which had financed the construction of their building, seeking indemnification from Home for the judgment in favor of Buehner. At their September 1983 bench trial, appellants advanced three theories of recovery: first, that Home breached its contract with appellants by failing to require adequate construction bonding for the project; second, that Home breached its contract with appellants by following improper disbursement methods; and third, that Home negli-gently disbursed construction loan proceeds.

Appellants do not challenge the trial court's adverse rulings on either their tort or their "disbursement methods" contract theories. They only challenge the court's adverse ruling on their first contract theory, and Home cross-appeals the court's ruling denying its claim for attorney fees.

The following findings of fact and conclusions of law are relevant to the issues on appeal.

## FINDINGS OF FACT

1. On or about June 1, 1980, F.C. Stangl III ("Stangl") and Grant P. Bagley ("Bagley") entered into a joint venture for the construction of a building on the Southeast corner of Fifth South and Fourth East, Salt Lake City, Utah (the "Building").

2. In furtherance of the said joint venture, a partnership known as UWC Associates ("UWC") was organized with Utah Women's Clinic, Inc., ("Clinic") as general partner and Clinic and Stangl as limited partners. The ownership of the partnership was as follows:

75% Clinic

25% Stangl

Stangl gave a 10 percent interest in the partnership to Wayne R. Newton ("Newton") who also became a limited partner.

3. Prior to and during the construction of the Building, Stangl and Newton each undertook certain management duties and responsibilities and joined in the making of business decisions as partners of UWC and signed documents on behalf of UWC.

4. On or about June 13, 1980, UWC entered into a contract with Stangl, dba Stangl Construction Company ..., whereby the latter agreed to construct the shell of the Building to be owned by UWC.

5. On June 4, 1983, Home Savings and Loan ["Home"] gave a [Construction

---

1. *See* Utah Code Ann. § 14–2–2 (1986) (repealed 1987).

Commitment Letter] ... to UWC, Bagley, Newton and Stangl (collectively sometimes hereinafter referred to as "Borrowers") for a construction loan in the amount of $750,000.00 (the "Loan") for the construction of the [B]uilding.

6. On or about June 27, 1980, the loan transaction was closed and the following documents were executed:

(a) Construction Loan Agreement....

(b) Trust Deed Note....

(c) Trust Deed....

(All of the above documents including the [Construction Commitment Letter] are sometimes hereinafter referred to as the "Loan Documents"). The Loan Documents were also executed by Bagley, Stangl and Newton as partners of UWC. These documents were also signed individually by each of the said parties.

7. The [Construction Commitment Letter] at paragraph 9 states as follows:

"Lender shall require adequate insurance and construction and other bonds be carried by the builder/developer as deemed necessary and approved by Lender, which matters shall be defined in a separate agreement."

At the request of UWC and Stangl, the bond requirement was waived by Home....

....

## CONCLUSIONS OF LAW

....

5. The Borrowers waived the bond requirement contained in paragraph 9 of the Construction Commitment [Letter].

6. Stangl, in requesting that the bond be waived, acted with real or apparent authority on behalf of the owner, UWC.

7. That Stangl and Newton became general partners of UWC since their action as partners went beyond the limited scope of a limited partner.

8. Third–Party Plaintiffs are estopped to assert the waiver of the bond requirement by Home ... as a breach of Home['s] ... responsibilities under the contract.

9. Defendant, Home ... are [sic] not entitled to an award of attorney fees.

## I

Appellants challenge the sufficiency of the evidence to support the trial court's ruling that they waived or were estopped from asserting the "bond requirement" in paragraph 9. Home argues for the first time on appeal that paragraph 9 never imposed a contractual duty on itself to require that adequate bonds be furnished.[2] Home claims that the provision was included in the construction commitment letter to protect Home by allowing it to impose a bond requirement if it saw fit to do so.

 Appellants rely upon *Bangerter v. Poulton*[3] in support of their argument that Home is precluded from claiming for the first time on appeal that paragraph 9 did not impose a bonding requirement on the bank.[4] But application of this principle

---

**2.** At argument, counsel for Home claimed he raised the issue at trial during his closing argument. However, counsel told the trial court he had "no desire" to have his argument reported. Before a party may advance an issue on appeal, the record must clearly show that it was timely presented to the trial court in a manner sufficient to obtain a ruling thereon. *See, e.g., Franklin Fin. v. New Empire Dev. Co.,* 659 P.2d 1040, 1045 (Utah 1983).

Also at argument, counsel for appellants asserted that Home was foreclosed from claiming that paragraph 9 did not impose a bonding duty since Home had failed to perfect a cross-appeal on this point. *See* Utah R.Civ.P. 74(b) (superseded by adoption of rule 4(d) of the Rules of the Utah Supreme Court). Since Home had no dissatisfaction with the trial court's judgment as entered with respect to its obligations under the construction commitment letter, a cross-appeal on this issue would not have been appropriate. *Compare In re Estate of Lewis,* 738 P.2d 617, 623 (Utah 1987) (respondent precluded from seeking affirmative relief by failure to timely file cross-appeal), *with Halladay v. Cluff,* 739 P.2d 643, 644–45 (Utah Ct.App.1987) (cross-appeal should not be perfected if respondent only wants judgment affirmed).

**3.** 663 P.2d 100 (Utah 1983).

**4.** *See id.* at 102 ("It is axiomatic that defenses and claims not raised by the parties in the trial cannot be considered for the first time on appeal." (Citations omitted.)); *see also Loveland v. Orem City,* 746 P.2d 763, 767 (Utah 1987);

in no sense forecloses application of all other rules of appellate review.[5] One such principle is that we may affirm trial court decisions on any proper ground(s), despite the trial court's having assigned another reason for its ruling.[6] In this case, we view the trial court as having erred in construing the parties' agreement. However, as explained below, we conclude that paragraph 9 did not impose a duty on Home, and therefore we affirm the trial court's judgment in favor of Home.

The interpretation of a written contract may be a question of law determined by the words in the agreement.[7] In this regard, a cardinal rule in construing such a contract is to give effect to the intentions of the parties, and if possible, these intentions should be gleaned from an examination of the text of the contract itself.[8] Additionally, it is axiomatic that a contract should be interpreted so as to harmonize all of its provisions and all of its terms, and all of its terms should be given effect if it is possible to do so.[9] If a trial court interprets a contract as a matter of law, as was obviously the case here, we accord its construction no particular weight and review its actions under a correction-of-error standard.[10]

■ In the instant case, the trial court did not indicate that it found the contract was not integrated and did not find it ambiguous; there are no findings of fact respecting the intentions of the parties based upon extrinsic evidence. And at one point during trial, the court stated that the construction commitment letter spoke for itself. Moreover, on appeal the parties have not argued that the contract was not integrated. Nor can we say that paragraph 9 is ambiguous. Contract terms are not necessarily ambiguous simply because one party seeks to endow them with a different meaning than that relied upon by the drafter.[11]

■ An examination of paragraph 9 in the construction commitment letter convinces us that the provision does not impose the duty on Home alleged by appellants. If we were to agree that the phrase "shall require" mandated that Home was required to insure for bonding, then the phrase "as deemed necessary and approved by lender, which matters shall be defined in a separate agreement" would be rendered a nullity. Moreover, contrary to appellants' position at argument, the phrase "as deemed necessary and approved by lender"

*Topik v. Thurber,* 739 P.2d 1101, 1103 (Utah 1987).

5. *See Branch v. Western Petroleum, Inc.,* 657 P.2d 267, 276 (Utah 1982). *But see L & M Corp. v. Loader,* 688 P.2d 448, 449–50 (Utah 1984).

6. *E.g., City Elec. v. Industrial Indem. Co.,* 683 P.2d 1053, 1060 (Utah 1984); *In re Estate of Hock,* 655 P.2d 1111, 1114 (Utah 1982); *Rice, Melby Enter., Inc. v. Salt Lake County,* 646 P.2d 696, 698 n. 3 (Utah 1982).

7. *Kimball v. Campbell,* 699 P.2d 714, 716 (Utah 1985); *accord Colonial Leasing Co. v. Larsen Bros. Constr. Co.,* 731 P.2d 483, 488 (Utah 1986); *Morris v. Mountain States Tel. & Tel. Co.,* 658 P.2d 1199, 1200–01 (Utah 1983); *O'Hara v. Hall,* 628 P.2d 1289, 1290–91 (Utah 1981); *Overson v. United States Fidelity & Guar. Co.,* 587 P.2d 149, 151 (Utah 1978).

8. *Atlas Corp. v. Clovis Nat'l Bank,* 737 P.2d 225, 229 (Utah 1987) (citing *DuBois v. Nye,* 584 P.2d 823 (Utah 1978); *Oberhansly v. Earle,* 572 P.2d 1384 (Utah 1977)); *Land v. Land,* 605 P.2d 1248, 1251 (Utah 1980); *see also Hal Taylor Assocs. v. UnionAmerica, Inc.,* 657 P.2d 743, 749 (Utah 1982); *Utah State Medical Ass'n v. Utah State Employees Credit Union,* 655 P.2d 643, 646 (Utah 1982); *Jones v. Hinkle,* 611 P.2d 733, 735 (Utah 1980).

9. *Larrabee v. Royal Dairy Prods. Co.,* 614 P.2d 160, 162–63 (Utah 1980); *Jones,* 611 P.2d at 735; *Minshew v. Chevron Oil Co.,* 575 P.2d 192, 194 (Utah 1978).

10. *See supra* note 7.

11. *E.g., Jones,* 611 P.2d at 735; *Land,* 605 P.2d at 1251; *Camp v. Deseret Mut. Benefit Ass'n,* 589 P.2d 780, 782 (Utah 1979); *see Kimball,* 699 P.2d at 716; *see also Faulkner v. Farnsworth,* 665 P.2d 1292, 1293 (Utah 1983) (whether ambiguity exists is question of law to be decided by trial court before parol evidence admitted); *Morris,* 658 P.2d at 1201; *Big Butte Ranch, Inc. v. Holm,* 570 P.2d 690, 691 (Utah 1977) ("[T]he court should first examine the language of the instruments and accord to it the weight and effect which it may show was intended and if the meaning is ambiguous or uncertain then consider parol evidence of the parties' intentions." (Footnote omitted.)).

cannot logically be read as modifying only the terms "other bonds."

In view of our conclusion, appellants' reliance on *Skousen v. Smith* [12] and *General Mills, Inc. v. Cragun* [13] to support their argument that the construction commitment letter must be construed more strongly against its drafter, Home, is misplaced in this case.[14] As we stated in *Auto Lease Co. v. Central Mutual Insurance Co.*: [15]

> [T]hat rule has no application unless there is some genuine ambiguity or uncertainty in the language upon which reasonable minds may differ as to the meaning. That requirement is not satisfied because a party may get a different meaning by placing a forced or strained construction on it in accordance with his interest. The test to be applied is: would the meaning be plain to a person of ordinary intelligence and understanding, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, including the purpose of the policy. If so, the special rule of construction is obviously unnecessary.[16]

The other relevant arguments advanced in favor of reversal do not undermine our decision. By relying upon parol evidence to support their claim that paragraph 9 contains a bonding requirement, appellants seemingly argue that the provision is ambiguous. Specifically, they contend that Home's executive vice president at the time of the loan, Fred Smolka "understood" the letter of commitment to require Home to insure that construction bonds were provided. However, this argument does not withstand scrutiny. Appellants quote the following portion of Smolka's testimony in support of their argument:

Q. Did Home Savings and Loan require any construction bond from any contractor or subcontractor on this job?

A. It was originally written that they [UWC] would provide that, but at their request it was waived.

. . . .

Q. Mr. Smolka, my question is whether Home required that any bond, construction bond, be furnished by any contractor or subcontractor on the UWC Associates job?

A. Not that I'm aware of.

Appellants also quote the following testimony of Smolka's associate, William Cox:

Q. ... Tell us what was said to your best recollection then.

A. Basically what I just said, that he had the commitment letter there before him and he asked us not to require a bond because of the fact that he had an ownership interest in it, and that other lenders didn't require him to post these kind of bonds in these kind of projects, and it was expensive.

Q. What did you do after this conversation?

A. I went up and talked to Mr. Smolka about whether we would waive the bond.

Q. Will you tell us what was said.

A. Basically we just came to the conclusion that based on Mr. Stangl's personal financial statement and the fact that he was the general contractor and one of our borrowers, the other financial statements of the individuals that we had as security for our loan, that we would not require a bond.

This testimony is in no sense an admission or "understanding" on the part of Home that it was *required* to insure that adequate construction bonds were procured by Stangl. To the contrary, the language re-

---

**12.** 27 Utah 2d 169, 171, 493 P.2d 1003, 1005 (1972).

**13.** 103 Utah 239, 248, 134 P.2d 1089, 1093–94 (1943).

**14.** There is no dispute that the construction commitment letter and the construction loan agreement were prepared by Home. The construction commitment letter was signed by Home's representative, Smolka, and appellants Bagley, Stangl, and Newton. The letter was incorporated into the construction agreement, and the letter itself provided that the parties agreed to the terms of the construction agreement.

**15.** 7 Utah 2d 336, 325 P.2d 264 (1958).

**16.** *Id.* at 339, 325 P.2d at 266 (footnotes omitted).

inforces Home's position that paragraph 9 was included to benefit Home by allowing it to require a bond if it felt it was necessary to do so. Thus, appellants' argument does not follow.

Ironically, the record reveals that a bond was probably never even contemplated by appellants. When asked whether he expected a construction bond to be furnished, Bagley responded, "I'm not sure that the subject ever really came up. So I don't know that it was something that was ever considered." Bagley testified that he never talked to Home concerning the subject of bonds. Stangl testified:

> What I'm telling you is that I don't recall the specific instance of discussing a bond with someone at Home Savings. We have done a lot of buildings, and it's not unusual to have a conversation about a bond. It wouldn't be unusual for me to have had a conversation with someone there about it. My response, when a lender requires me to bond a building that I have involvement with ownership in, is that I don't furnish it. It's too difficult. It's too expensive. It's time consuming. I would just as soon not have the job as to furnish the bond. If I was asked for it, I responded that same way because I do it a hundred percent of the time.

Stangl also testified that he did not recall expressing to Home that UWC wanted a bond.

The two-paragraph construction contract between Stangl and UWC was silent concerning any bond requirement, despite the fact that counsel for appellants conceded at argument that bond requirements are "oftentimes" set forth in the construction contract. Moreover, Bagley's one-paragraph acceptance letter stated nothing about bonding. However, it did state, in pertinent part: "Should problems arise with financing I hereby agree to pay all construction costs incurred but reserve the right to terminate the additional costs incurred upon notice to F.C. Stangl Construction Co."

Finally, we note that paragraph 9 itself states that bond and insurance matters shall be defined in a "separate agreement." And appellants concede, as they must, that no such agreement ever existed. Thus, there was no agreement setting out the type of bond or the amount thereof, critical terms considering that Stangl was only the general contractor on a portion of the building (the shell) and therefore was responsible for only a portion of the construction.

Appellants, however, quote from *Bunnell v. Bills*[17] in support of their argument that a separate agreement was not a condition precedent to the bond requirement. In *Bunnell*, defendant Stevens entered into a commercial listing and sales agency contract with a realtor. The realtor found a buyer, Bunnell, who offered a down payment on Stevens' property and annual payments until the purchase price was paid. Stevens and Bunnell signed a receipt to this effect. Stevens subsequently refused to perform, and Bunnell recovered damages. On appeal, Stevens argued, in part, that because the receipt failed to set forth the terms of the transfer of Bunnell's property, which was to constitute a portion of the down payment, the receipt was merely an agreement to agree.[18] This Court stated:

> Stevens argues that because the receipt did not set forth the "price, terms, interest, etc." relating to the Bunnell property, it was to be handled as a separate transaction. However, when the receipt is interpreted under the circumstances that existed at the time of its creation, and in light of the conduct and statements of the parties, it is clear that the transfer of Bunnell's property was intended as part of the whole agreement. *The fact that part of the performance is that the parties will enter into a contract in the future does not render the original agreement any less binding.* The transfer of Bunnell's property was no more a separate transaction than

**17.** 13 Utah 2d 83, 368 P.2d 597 (1962).

**18.** *Id.* at 85–86, 368 P.2d at 599–600.

were the cash payments that Bunnell had agreed to make in the future.[19]

When read in context, the emphasized principle, relied upon by appellants out of context, is not controlling in this case since the bonding issue was clearly to be dealt with as a separate transaction, if required by Home, as stated in paragraph 9.

Appellants' reliance on the following language from *Coleman Engineering Co. v. North American Aviation, Inc.,*[20] is also unpersuasive: "'Where the matters left for future agreement are unessential, each party will be forced to accept a reasonable determination of the unsettled point or if possible the unsettled point may be left unperformed and the remainder of the contract be enforced.'"[21] In this case, there is no evidence that the parties agreed to reserve the bonding issue for future agreement.

## II

 Home contends that the lower court erred in not awarding attorney fees. It seeks reversal of the lower court's decision denying it attorney fees and an award of attorney fees for the trial of the case and for the prosecution of this appeal.

The parties stipulated at trial that Home's reasonable attorney fees amounted to $6,000. However, the parties did not agree on whether appellants' actions fell within the attorney fee provisions in the agreement. Of pivotal concern to us is the lack of any findings to support the trial court's ruling that no attorney fees would be allowed,[22] this despite the fact that Home prepared the findings; we are mindful that the trial court did not announce its reasons at trial for its ruling.

The judgment in favor of Home is affirmed. The case is remanded to the trial court for entry of findings to support its conclusion that Home is not entitled to attorney fees.

HOWE, DURHAM and ZIMMERMAN, JJ., and ORME, Court of Appeals Judge, concur.

STEWART, Associate C.J., does not participate herein; ORME, Court of Appeals Judge, sat.

---

19. *Id.* at 87, 368 P.2d at 600 (emphasis added; footnotes omitted).

20. 65 Cal.2d 396, 420 P.2d 713, 55 Cal.Rptr. 1 (1966) (en banc).

21. 420 P.2d at 720, 55 Cal.Rptr. at 8 (citations omitted).

22. *See Acton v. Deliran,* 737 P.2d 996, 998–99 (Utah 1987).