Ronnie CECALA, Plaintiff
and Appellant,

v.

James THORLEY; C. Jeffrey Morby;
Terracor, a Utah corporation; Architectural Control Committee of Bloomington Ranches No. 4 Subdivision; C. Bruce Miller; City of St. George; and Dixie State Bank, a Utah corporation, Defendants and Respondents.

No. 880195–CA.

Court of Appeals of Utah.

Nov. 18, 1988.

Rick Cecala (argued), St. George, for plaintiff and appellant.

Anthony J. Rampton (argued), Salt Lake City, for Terracor, Architectural Control Committee of Bloomington, and Bruce Miller.

Russell J. Gallian (argued), St. George, for Dixie State Bank.

T.W. Shumway, St. George City Atty., St. George, for City of St. George.

Before DAVIDSON, BILLINGS and JACKSON, JJ.

OPINION

JACKSON, Judge:

Ronnie Cecala appeals from a summary judgment against her granted to all respondents, claiming the trial court misinterpreted voting rights language in restrictive covenants applicable to Bloomington Ranches No. 4 Subdivision. The issue before us is whether those covenants provide for one vote per lot, as the trial court concluded, or one vote per owner when property owners elect the subdivision's architectural committee. We affirm.

Johnson Land Company, a partnership comprised of three individuals, filed the covenants for this subdivision in 1968 and a plat which divided the tract into twenty lots, numbered 155 through 174. The partnership's successor, Terracor, sold all of the lots to third parties by December 19, 1983. Fourteen condominium townhouses, including one owned by appellant Cecala, now occupy part of Lot 162 and share the balance of the lot as common area. Lot

162 was not further subdivided. Respondents Thorley and Morby own part of Lot 155.

On December 19, 1983, an election was held in which owners of eighteen of the twenty subdivision lots approved the respondent Architectural Control Committee of Bloomington Ranches No. 4 ("Committee"), consisting of three members. The Committee subsequently approved plans and specifications submitted by Thorley and Morby for commercial development of Lot 155, specifically, for construction and operation of a gas station and convenience store. The protective covenants do not prohibit commercial development or use within the subdivision; however, they do limit the use of lots to those purposes approved by the architectural committee.

Cecala filed suit seeking to nullify the Committee's approval of the Thorley–Morby plans, contending it was not elected in compliance with the requirements in Article II, Section 6 of the covenants, captioned "Architectural Committee." The last two sentences of that section, with our emphasis added, state:

> When all lots in said tract have been sold by Grantor, said plans and specifications shall be approved by an architectural committee approved by *a majority of owners of lots* in the property herein described and only owners of said lots shall be privileged to vote for said architectural committee. The Grantor shall have the right to appoint members of the architectural committee until such time as all lots in the tract have been sold by the Grantor.

In opposition to respondents' motion for summary judgment, Cecala argued this emphasized language requires that each owner cast one vote for the Committee, regardless of the number of lots owned. She also contended that, as an owner of one of the townhouses, she is an "owner" of a "lot" entitled to cast a vote. The trial court, however, without resorting to extrinsic evidence, interpreted the restrictive covenants to mean that the owner (or owners) of each of the twenty subdivision lots was entitled to cast one vote. Based on this construc-

tion of the voting rights provision, the court concluded the Committee was properly elected.

■ The interpretation of restrictive covenants generally requires the application of the same rules of construction used to interpret contracts. *Gosnay v. Big Sky Owners Ass'n*, 205 Mont. 221, 666 P.2d 1247, 1250 (1983). *See Sun Valley Center for the Arts & Humanities, Inc. v. Sun Valley Co.*, 107 Idaho 411, 690 P.2d 346 (1984); *Timmerman v. Gabriel*, 155 Mont. 294, 470 P.2d 528 (1970). Like the interpretation of the words of a contract without resort to extrinsic evidence, the trial court's interpretation of the words of the covenants in this case presents a question of law. *See Zions First Nat'l Bank v. National Am. Title Ins. Co.*, 749 P.2d 651, 653 (Utah 1988); *Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985). On appeal, we accord the trial court's ruling on such a question no particular weight, but review it for correctness. *Buehner Block Co. v. UWC Assocs.*, 752 P.2d 892, 895 (Utah 1988); *Zions First Nat'l Bank*, 749 P.2d at 653.

■ Appellant Cecala asks us to look solely at the words "majority of owners of lots" in Article II, Section 6 and divine their meaning in the abstract. Standing alone, their meaning is susceptible to two different but plausible interpretations. In such a case, the intention of the parties to the covenants is controlling. *Becker v. Arnfeld*, 171 Colo. 256, 466 P.2d 479 (1970); *Heath v. Parker*, 93 N.M. 680, 604 P.2d 818 (1980). If possible, that intention must be ascertained from the entire language of the covenant agreement. *Becker*, 466 P.2d at 480. *See Buehner Block Co.*, 752 P.2d at 895. We must look to more than the five words specified, having "recourse to every aid, rule, or canon of construction to ascertain the intention of the parties." *Parrish v. Richards*, 8 Utah 2d 419, 336 P.2d 122, 123 (1959) (quoting *Reese Howell Co. v. Brown*, 48 Utah 142, 158 P. 684 (1916)).

■ Turning to the document itself, we find aid in Article II, Section 4, which states that all conditions, covenants and

reservations shall be construed together. The initial paragraph of the document refers to the official plat on file, consisting of Lots 155 through 174, and states, "the location and dimensions of *said lots* are as shown on said plat." (Emphasis added). The general restriction dealing with temporary structures states, "No old or second-hand structures shall be moved onto any of *said lots*, it being the intention hereof that all dwelling and other buildings to be erected on *said lots* ... shall be of new construction...." (Emphasis added). The phrase regarding voting rights contains the same reference, i.e., "only owners of *said lots* shall be privileged to vote for said architectural committee." (Emphasis added).

The "said lots" are twenty in number, Lots 155 through 174. We find nothing in the covenants to show any intent by the grantor to give one vote to each person or entity that has some ownership interest in a single lot, for a total number of voters that would be potentially limitless and not readily ascertainable. The "said lot" language supports a construction of the voting rights provision that allots one vote per lot, regardless of the number of owners of that lot.

Moreover, we believe other parts of the covenants convincingly demonstrate the grantor's consistent intent to vest control over the development of the subdivision in persons having a majority interest based on the area owned. Article II, Section 1, for example, addresses the procedures for modification of the restrictive covenants and conditions applicable to the subdivision. After an initial twenty-year period, the restrictions were to remain in force unless "a written agreement executed by the then record owners of more than three-fourths in area of said property" be placed of record within a specified time frame. Any further change, modification, or termination of the restrictive covenants requires "mutual written agreement with not less than seventy percent (70%) of the then owners of record title of said property," duly executed and placed of record. How-

ever, neither of the foregoing procedures could be utilized "without the written consent ... of the owners of record of not less than two-thirds in area of all lands ... held in private ownership within five hundred feet ... of the property concerning which a change or modification is sought to be made."

Each of these provisions in Article II, Section 1 manifests an intent that land area ownership be the controlling factor in the ongoing development of the subdivision. For change or termination of restrictive covenants, always a serious matter, more than a simple majority of the land ownership is required to sign a written agreement. For election of the architectural committee, a less serious matter because the committee cannot approve any plans not in compliance with the governing restrictive covenants, approval by the owners of a simple majority of lots will do.

Cecala relies on a line of cases beginning with *Beck v. Council of the City of St. Paul*, 235 Minn. 56, 50 N.W.2d 81 (1951). In *Beck*, the court interpreted a city charter provision concerning the vacation of streets as public thoroughfares, upon the petition of "the majority of the owners of the property on the line of such ... streets." *Beck*, 50 N.W.2d at 82. The issue presented was whether the numerical strength of those who were owners was to be determined on a per capita basis or according to the amount or number of parcels of abutting land which they owned. Noting that another paragraph referred to such petitioners as "persons," the court said the entire emphasis in the charter provisions at issue was upon abutting property owners as separate individuals, not upon the quantity or area of their respective street frontage, a concept of ownership used elsewhere in the city charter. *Id.* at 83. Accordingly, the Minnesota Supreme Court held that the charter term "majority of the owners of property" referred to a numerical majority of the individual owners and not to owners of a majority of the abutting parcels or a major part of the lineal frontage. *Id.*[1]

---

1.  The same interpretation has been made, based

on slightly varying language, in *Duffy v. Sun-*

Respondents rely on a line of cases beginning with *Diamond Bar Development Corp. v. Superior Court,* 60 Cal.App.3d 330, 131 Cal.Rptr. 458 (1976), in which the appellate court interpreted the following subdivision restrictive covenant:

Section 2. Modification or Termination

Modification or termination of all or any of the covenants, conditions or restrictions herein may be effected from time to time as to said property or any portion thereof by written instrument duly executed by not less than 70% of the then owners, including vendees under installment sale contracts, of property then covered by this Declaration....

As in the instant case, the opposing parties in *Diamond Bar* argued in favor of two competing interpretations of the covenant language: (1) an amendment of the covenants is valid when consented to by persons owning more than seventy percent of the property in the subdivision; or (2) an amendment is valid only when at least seventy percent of those persons owning lots consent thereto.

Stating that the whole document was to be considered in interpreting each clause of it, the court first found in the introductory clause the purpose of the covenants, i.e., the protection, maintenance, and development of the total property. The court noted the draftsman clearly intended that minority property holders be protected from the preferences of a bare majority. But the question remaining was whether the draftsman feared a majority tyranny based upon sheer numbers of property owners or a majority tyranny based upon extent of ownership. *Id.* 60 Cal.App. at 334, 131 Cal.Rptr. at 460.

The court reasoned it was not sensible to require one to determine how many persons owned lots at the time an amendment to the covenants was acted upon because that number was subject to continual fluctuation. *Id.* at 335, 131 Cal.Rptr. at 461. Furthermore, investors might purchase more than one lot and would reasonably expect the ability to influence amendments would be commensurate with the extent of their investment; that expectation could only be encouraged by allocation of voting strength based on the extent of property owned. *Id.* at 336, 131 Cal.Rptr. at 461. The *Diamond Bar* court thus concluded that Section 2 of the covenants, quoted above, permitted an amendment if consented to by persons owning at least seventy percent of the total number of lots in the subdivision, on a "one lot/one vote" basis.[2]

In construing the voting rights provision in the protective covenants before us, we have proceeded in the same manner as the court in *Beck* and other cases cited by the parties. That is, we have derived its meaning from the covenants as a whole, not on the basis of isolated words. Nonetheless, our rationale parallels that in *Diamond Bar* and leads us to affirm the interpretation and judgment of the court below.

DAVIDSON and BILLINGS, JJ., concur.

---

*burst Farms East Mut. Water & Agric. Co.,* 124 Ariz. 413, 604 P.2d 1124 (1979) ("a majority of the then owners of lots" means "a majority of property owners" rather than "owners of a majority of lots"); *Cieri v. Gorton,* 179 Mont. 167, 587 P.2d 14 (1978) ("a majority of the then owners of the lots affected thereby"); *French v. Diamond Hill–Jarvis Civic League,* 724 S.W.2d 921 (Tex.App.1987) (provision permitting amendment of restrictive covenants by "a majority of the then owners of the lots" does *not* mean "the owners of the majority of lots").

**2.** *Accord Norwood–Norland Homeowners' Ass'n v. Dade County,* 511 So.2d 1009 (Fla.App.1987) (modification of restrictive covenant requiring

consent of "a majority of the property owners within 350 ft. of the property for which such modification is proposed" permits a lot owner in the subdivision to cast one vote for each lot owned), *rev. denied,* 520 So.2d 585 (Fla.1988); *Perkins v. B & W Contractors, Inc.,* 439 So.2d 652 (La.App.1983) (provision stating restrictive covenants can be amended by "a majority of the owners of the lots" requires the consent of the owners of a majority of the lots). *See also LaBrayere v. LaBrayere,* 676 S.W.2d 522 (Mo. App.1984) (provision allowing modification of restrictive covenants by "the owners of eight (8) or more of the lots" in a subdivision is enforceable according to its terms even if only one owner owns the eight lots).