CARLO M. AND ELSIE J. CIERI ET AL., PLAINTIFFS AND RESPOND-
ENTS, *v.* EDWARD L. AND VIRGINIA R. GORTON AND JOHN J.
AND PHYLLIS L. O'ROURKE, DEFENDANTS AND APPELLANTS.

No. 14073.
Submitted Sept. 22, 1978.
Decided Nov. 16, 1978.
587 P.2d 14.

Bolinger & Wellcome, Bozeman, Roy Andes (argued), Bozeman, Swandal & Douglass, Livingston, for defendants and appellants.

Byron L. Robb (argued), Livingston, for plaintiffs and respondents.

MR. JUSTICE SHEEHY delivered the opinion of the Court.

Green Acres Subdivision, east of Livingston, was platted on June 4, 1959 and contained 110 lots. The subdivision was subject to various restrictive covenants, one of which stated:

"These covenants may be changed in whole or in part at any time by an instrument in writing signed by a majority of the then owners of the lots affected thereby . . ."

On November 24, 1976, appellants purchased 69 of the 110 lots. Appellants have made no improvements on these lots nor do they live in the subdivision. Respondents, however, have constructed 15 homes on their lots. On March 28, 1977, appellants filed with the Park County clerk and recorder a document entitled Amendments to Restrictive Covenants which proposed to remove all restrictive covenants. This document was signed by appellants Gorton, who owned a majority of the lots (69 of 110), but who obviously did not constitute a majority of the owners of the lots (2 of 41).

On April 14, 1977, respondents filed a complaint in the District Court of the Sixth Judicial District, Park County, seeking to enjoin appellants from any action which would violate the original restrictive covenants. After the parties stipulated to agreed facts, submitted written briefs and oral argument on the first count of the two count complaint, the District Court found the original restrictive covenants required the consent of a majority of the owners of the lots rather than the owners of a majority of the lots to amend the covenants. Because appellants did not constitute "a majority of the then owners", the Court issued respondents their requested permanent injunction. The District Court preserved respondents' right to trial on count 2 of the complaint should its judgment be overturned on appeal. It is from this judgment and permanent injunction that appellants appeal.

The only issue in this appeal is whether the District Court properly construed the language "a majority of the then owners of the lots affected thereby" to mean a majority of owners rather than owners of a majority of lots. We hold the District Court's construction of the language in question to be correct.

The issue presented is one of first impression in Montana. Appellants have therefore urged this Court to accept as dispositive of the issue a California case, *Diamond Bar Development Corporation v. Superior Court, County of Los Angeles* (Cal.App. 1976), 60 Cal.App.2d 330 Cal.Rptr. 458. Although the facts of *Diamond Bar* are similar to those in the present appeal, there are important factual distinctions, and we decline to consider the case as binding precedent. In *Diamond Bar* members of an association who owned lots in a subdivision subject to restrictive covenants sought to amend a portion of those covenants. 131 Cal.Rptr. at 459. The section of the covenants relating to modification stated that "modification . . . may be effected . . . by written instrument duly executed by not less than 70 percent of the then owners . . . of property covered by this Declaration." *Diamond Bar*, supra. The members who filed the proposed amendment owned more than 70 percent of the lots, but did not constitute more than 70 percent of the property owners (though they did constitute 62 percent of the property owners). 131 Cal.Rpts. at 460. The California court however, adopted the construction contended for by the members, namely, that an amendment to the covenants would be approved when adopted by owners of seventy percent of the lots. 131 Cal.Rptr. at 461.

Appellants argue this Court should follow the decision of the California court. We decline to do so because as mentioned *Diamond Bar* can be distinguished factually in several important areas. First, unlike the covenants in *Diamond Bar* defined "owner" as the record owner of a fee simple title to any lot which was a part of the subdivision, a fact the California court considered important. 131 Cal.Rptr. at 459, 461. Thus, one individual could be several "owners" depending on how many lots he or she owned. Second, although less than 70 percent of the owners consented to the pro-

posed amendment, a clear majority (62 percent) *did* consent to the change. 131 Cal.Rptr. at 460. In this appeal only 2 out of 41 owners consent to the amendment. Finally, the object of the proposed amendment in *Diamond Bar* was the required perimeter fencing around each lot. 131 Cal.Rptr. at 459. Here the proposed amendment would completely abolish the restrictive covenants.

Although the precise issue involved in this appeal is new to this Court, we are not without Montana authority to serve as guidelines in making our determination. Section 13-710, R.C.M.1947, states:

"The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them in usage, in which case the latter must be followed."

Furthermore, this Court has stated in construing the language of restrictive covenants:

". . . that where the words are plain, unambiguous, direct and certain and admit of but one meaning, then it is the duty of this Court to declare [only] what the terms of the covenants contain ..." *Higdem v. Whitham* (1975), 167 Mont. 201, 536 P.2d 1185, 1189; *Kelly v. Lovejoy* (1977), 172 Mont. 516, 565 P.2d 321, 323, (citing *Higdem*).

Therefore, unless the phrase in question in this appeal, "a majority of the then owners of the lots affected thereby," is used in a technical sense, or has a special meaning in its common usage, or is ambiguous, the decision of the District Court should be affirmed.

Appellants have not argued, nor can we see how it could be argued, that the phrase has a technical meaning used in these covenants. As to whether the phrase has a special meaning in common usage or whether it is ambiguous, though Montana authority on point is lacking, other jurisdictions construing the phrase have found it clear and unambiguous and to mean what it says, namely, a majority of owners.

In *Beck v. Council of the City of St. Paul* (1951), 235 Minn. 56, 50 N.W.2d 81, the court was construing a phrase in the city

charter regarding the necessary requisites for vacations of a city street. That phrase, "the majority of the owners of the property on the line of such . . . streets," 50 N.W.2d at 82, is very much like the language we are faced with here. Although the background facts in *Beck* differ from those in this appeal, the issue the Minnesota Supreme Court faced was the same issue this appeal raises, and that issue is not what constitutes an owner but "whether the numerical strength of those who are owners in fact is to be determined on a per capita basis or according to the amount or the number of parcels of land which they own." 50 N.W.2d at 82, 82. The Minnesota court determined the answer to this question lay in the construction of the phrase "the majority of the owners of the property" and found the phrase to mean a majority of individual owners and not to a majority of the estates or tracts. 50 N.W.2d at 82. The court further stated the word "majority" refers to a quantity measured by numbers and not by area, and that the absurd result of one individual constituting a majority because he owned many tracts would occur if the latter construction were adopted. *Beck*, supra. A similar result would occur in this appeal were we to accept the appellants' contention that "majority" refers to area and not numbers of owners.

The Alaska Supreme Court in *Stauber v. Granger* (Alaska 1972), 495 P.2d 67, 69, found the language "a majority of the then owners of the lots" to be clear and unambiguous and to mean a majority of owners. Similarly, the Louisiana Court in *Robinson v. Morris* (La.1973), 272 So.2d 444, 447, noted the phrase "majority of the then owners of the foot frontage" was clear and unambiguous and meant a majority of owners. The court in *White v. Lewis* (1972), 253 Ark. 476, 487 S.W.2d 615, 616, indicated the phrase "as majority of the owners of the lots" was not ambiguous and meant a majority of owners.

We therefore find the phrase "a majority of the then owners of the lots affected thereby" to mean a majority of property owners rather than a majority of lots. The District Court was correct in its construction of this phrase and its judgment should be affirmed.

■ A final reason exists for affirmance of the District Court. Appellants have argued to adopt the construction the District Court has placed on the language in question would work an economic hardship upon appellants. However, the equities of this situation, economic and otherwise, favor the respondents. For seventeen years prior to appellants' purchase of the majority of the subdivisions, lots were sold and homes were built based on the restrictions contained in the covenants. Appellants purchased their lots fully cognizant of these restrictions. Appellants do not reside in the subdivision. Appellants have obviously made a large financial investment, but the investment represented by fifteen homes constructed as these covenants require valued at today's real estate values looms equally as large. Thus, the argument of economic hardship is a two-edged sword cutting both ways.

Judgment affirmed.

MR. CHIEF JUSTICE HASWELL and JUSTICES HARRISON, SHEA and DALY concur.