J. FREDERICK RICE AND WIFE, DONNA RICE; AND DOUGLAS K. BRADLEY, PLAINTIFFS-APPELLEES v. DONALD COHOLAN AND WIFE, TERESA COHOLAN; MADISON DEVELOPMENT OF CHARLOTTE, LLC; JOHN SADRI CUSTOM HOMES, INC.; TEMPLE ISRAEL, INC.; MADISON GEER; BRYANT P. MARKS; NACHUM ESHET AND WIFE, MARY ESHET; GAYLE L. SMITH; ERNIE CASTELLANO AND WIFE, DEBBIE CASTELLANO; AND GEORGE S. CROUCH, JR., AND WIFE, MARY ANN C. CROUCH, DEFENDANTS-APPELLANTS

No. COA09-326

(Filed 6 July 2010)

**1. Appeal and Error— notice of appeal—certificate of service—not filed—time for filing notice tolled**

The Court of Appeals had jurisdiction to hear an appeal, even though the notice of appeal was not filed in the proper county within thirty days of the judgment, because no certificate of service was filed with the appealed order. The time for filing the notice of appeal was therefore tolled and the notice that was filed properly was timely.

**2. Appeal and Error— cross-assignments of error—not an alternative basis for supporting order**

Plaintiff's cross-assignments of error did not relate to an alternative basis in law for supporting the order appealed from and were overruled.

**3. Deeds— restrictive covenants—enforceability and termination**

A trial court order concluding that plaintiffs could enforce deed restrictions was reversed where fourteen of the eighteen lots in the subdivision contained the same or similar restrictions, there was a common grantor and a general plan of development, and the owners of lots encumbered by the restrictive covenants could enforce those covenants against owners of similarly restricted lots. A reference to a specific anniversary date did not limit termination of the restrictions to that date, and, applying the "one vote per lot" rationale, a majority of owners validly terminated the restrictions in the deeds by agreement.

Appeal by Defendants Donald Coholan and wife, Teresa Coholan, from order entered 14 August 2008 by Judge Richard D. Boner in Superior Court, Mecklenburg County. Heard in the Court of Appeals 30 September 2009.

*James, McElroy & Diehl, P.A., by John R. Buric and Jon P. Carroll, for Plaintiffs-Appellees.*

*Johnston, Allison & Hord, P.A., by Patrick E. Kelly and Daniel A. Merlin, for Defendants-Appellants.*

McGEE, Judge.

Plaintiffs filed this action on 16 November 2006 seeking to enforce deed restrictions on eighteen lots known as Jefferson Park and located on Jefferson Drive in Charlotte. Plaintiffs sought, *inter alia*, to enjoin development and subdivision of certain lots located within Jefferson Park. To support their claim, Plaintiffs relied on the restrictive covenants in the original deeds to Jefferson Park.

On 17 October 1945, Ralph Petree and wife, Margaret Petree (the Petrees), sold a plot of land along Jefferson Drive to Mercer J. Blankenship and wife, Marjorie W. Blankenship, and Malcolm B. Blankenship and wife, Bessie G. Blankenship (collectively the Blankenships). The Blankenships subdivided the real property into two blocks of nine lots each. The lots were platted on a map titled, "A Subdivision Plan Of A Part Of Jefferson Park Charlotte, N.C[.]" The map was dated 31 July 1946 and was filed with the Mecklenburg County Register of Deeds at Map Book 1166, Page 131.

*The Deeds and The Restrictions Therein*

Between 1946 and 1951, the Blankenships conveyed the lots in Jefferson Park as follows:

(1) Lots 1 and 3, Block 1, to the Mecklenburg Baptist Association (MBA). The deed conveying the property contained the following restrictions:

The aforesaid lot 1, Block 1, of Jefferson Park shall be used solely and exclusively for the erection of a Church Plant by the [MBA], provided that should [the MBA] dispose of same it shall be subject to the same restrictions and easements as shall be and are set out herein with reference to Lot 3, Block 1, of Jefferson Park, which are as follows: That said lot is to be used for residential purposes only, and no structure shall be erected . . . on said lot other than one detached single family building not to exceed 2 1/2 stories in height and a private garage for not more than three cars and such other outbuildings as are incident to the residence use of said lot. This lot shall not be subdivided, nor changed in any manner but shall remain as shown on said map. No building shall

be erected on said lot nearer than 100 feet to the Center Line of the Street on which it fronts, and no building shall be located nearer than 25 feet from any side lot line.

(2) Lot 9, Block 2, to T.B. Meadows and wife to be used as a lake site, and should the property not be so used, alternate restrictions would apply. Those alternate restrictions provided, in part, that the property was not to be subdivided nor used for non-residential purposes; only one house, not to exceed two and one-half stories in height, could be built on the lot; and the house could not be built within 100 feet of the center line of Jefferson Drive, nor within 25 feet of a side line.

(3) Lots 6 and 8, Block 2, to Russell Kistler. The deed stated that "[t]he said lot or parcel of land is hereby conveyed subject to the following restrictions and easements[,]" including that the lots could not be subdivided. The lots were to be used for only residential purposes and only one house, not to exceed two and one-half stories in height, could be built on the lots; and the house could not be built within 100 feet of the center line of Jefferson Drive, nor within 25 feet of a side line.

(4) Nine of the remaining lots were conveyed to other grantees. The deeds to each of these lots, including Lot 8, Block 1, contained restrictive covenants, including that: (a) the lots could not be subdivided; (b) the lots could be used for only residential purposes; (3) no structure other than one detached single family dwelling, not to exceed two and one half stories in height, could be constructed; and (4) each house built must be set back 100 feet from the center line of Jefferson Drive and 25 feet from any side line.

(5) Malcolm and Bessie Blankenship conveyed their one-half interest in Lot 2, Block 1, to Mercer J. and Marjorie Blankenship on 26 August 1948. Mercer J. and Marjorie Blankenship conveyed their interest in Lot 5, Block 2, to Malcolm and Bessie Blankenship on 26 October 1949; they also conveyed their interest in Lot 9, Block 1, to Malcolm and Bessie Blankenship on 4 August 1950. Finally, the Blankenships together transferred all of their collective interest in Lot 4, Block 2, to Ben and Katrina Blankenship on 26 October 1949. None of these four intra-family deeds contained any restrictions.

*Termination of Restrictions*

Each of the above-described deeds that did contain restrictive covenants also contained a clause concerning the termination of

restrictions. Each deed provided that the covenants were to run with the land and would be binding until 1 January 1975. After that date, the covenants would "automatically extend for successive periods of ten years" unless the covenants were terminated.

The deeds provided that the owners of lots so encumbered could vote to remove the restrictions, but the language in the deeds differed. The deeds to eight lots contained language permitting termination of restrictions upon a vote of the "majority of the then owners of said lots as shown on said map[.]" One deed allowed termination upon a vote of the "majority of the owners of Jefferson Park[.]" The deeds to three lots permitted termination upon a vote of the "majority of the then owners of said lots in Jefferson Park[.]" One deed permitted termination upon a vote of the "majority of the then owners of lots in Jefferson Park[.]" Another deed permitted termination upon a vote of the "majority of the then owners of this and other lots in Jefferson Park."

In 2006, Donald Coholan and wife, Teresa Coholan (the Coholans), purchased Lots 8 and 9, Block 1, along Jefferson Drive. Prior to the Coholans' purchase of these lots, K & P Development, LLC, owned the property and had subdivided the two lots into six lots. The attorney representing the Coholans at the real estate closing researched the issue of restrictive covenants and concluded that there were no effective restrictions which would prevent the Coholans from subdividing the real property. However, "out of an abundance of caution," the Coholans' attorney prepared a Termination of Restrictions Agreement (the Agreement), which was designed to terminate any restrictive covenants that might restrict the development of the lots in Jefferson Park. The Agreement was signed by the owners of ten of the eighteen lots in Jefferson Park on 5 September 2006 and was recorded 6 September 2006.

## Procedural History

Plaintiffs, as owners of lots in Jefferson Park, filed this action to prevent the Coholans from developing Lots 8 and 9, Block 1. The trial court entered a temporary restraining order on 16 November 2006, enjoining the Coholans from developing Lots 8 and 9, Block 1. The trial court later entered an order on 12 January 2007 that determined Plaintiffs' motion for preliminary injunction. In its order, the trial court made, *inter alia*, the following conclusions of law:

2. The Plaintiffs have made a significant showing that there is a uniform scheme of development with respect to Jefferson Park.

RICE v. COHOLAN

[205 N.C. App. 103 (2010)]

The fact that not all of the lots are restricted or the deeds do not contain identical language or restrictions is not dispositive, so long as the nature of the restrictions is the same.

. . .

4. The Deed Restrictions touch and concern eighteen (18) lots in Jefferson Park to which they attach, and both horizontal and vertical privity exists. As a result, any lot owner in Jefferson Park may enforce the Deed Restrictions against any other lot owner in Jefferson Park whose lot is encumbered by the Deed Restrictions.

. . .

7. Lot 8 is encumbered by the Deed Restrictions.

8. Lot 9 is not encumbered by the Deed Restrictions.

9. The Deed Restrictions have not been extinguished by the North Carolina Marketable Title Act, N.C.G.S. § 47B-1, *et seq.*, based upon the [c]ourt's finding that the residential exception of the Act (N.C.G.S. § 47B-3(13)) applies.

. . .

13. The purported Termination Agreement lacks execution by a majority of owners in Jefferson Park and is therefore ineffective.

. . .

15. The Deed Restrictions Prohibit Defendants from subdividing any portion of Lot 8.

16. The Deed Restrictions prohibit Defendants from constructing more than one (1) residential structure onto Lot 8.

17. The Deed Restrictions prohibit Defendants from constructing any building on Lot 8 that is closer than one hundred (100) feet to the centerline of Jefferson Drive or twenty-five (25) feet to the side lot line.

18. The Deed Restrictions are not enforceable with respect to Lot 9.

The trial court then dissolved the temporary restraining order and denied Plaintiffs' motion for preliminary injunction with respect to Lot 9. The trial court further granted Plaintiffs' motion for preliminary injunction as to Lot 8, enjoining the Coholans from subdividing or developing Lot 8.

Plaintiffs amended their complaint on 22 January 2007, naming their original co-plaintiffs, George and Mary Ann Crouch, as defendants. Plaintiffs sought to (1) enforce deed restrictions against all lots, including Lot 9, Block 1; and (2) invalidate the Agreement. A consent order and judgment was entered on 8 June 2007, dismissing Plaintiffs' claims as to Lot 9, Block 1.

Plaintiffs and the Coholans filed cross-motions for summary judgment. In an order entered 14 August 2008, the trial court denied the Coholans' motion in pertinent part and granted Plaintiffs' motion, thereby invalidating the Agreement and declaring the restrictions on Lot 8, Block 1 to be "in full force and effect." The trial court found that there were no genuine issues of material fact and made the following conclusions of law:

3. There was a common scheme of development for each of the lots referenced on the Map for which a set of Restrictive Covenants is found in the chain of title. The owners of the lots having the Restrictive Covenants in the chain of title can enforce the covenants against owners of similarly restricted lots. The owners of lots which do not have the Restrictive Covenants in the chain of title are not subject to the restrictions and therefore cannot be forced to comply with the restrictions.

4. For purposes of determining a "majority of owners," each owner of a lot located on the Map gets one (1) vote. In the event one individual or entity owns more than one lot, that individual or entity has only one (1) vote. The Restrictive Covenants do not contemplate a cumulation of votes.

5. In the plain language of the Marketable Title Act, the legislature pluralized the word "restrictions." As such, Section 13 of the Marketable Title Act is applicable, and the Marketable Title Act does not act to extinguish the Restrictive Covenants.

6. In the event a majority of owners subject to the Restrictive Covenants attempts to terminate the restrictions, the majority termination is only effective on the anniversary date of the restrictions. Absent unanimous agreement of the owners of the restricted lots, the Restrictions can not [sic] be terminated between anniversary dates.

The Coholans (hereinafter referred to as Defendants) appeal.

RICE v. COHOLAN

[205 N.C. App. 103 (2010)]

*Jurisdiction*

[1] As a preliminary matter, we address whether this appeal is properly before our Court. The order from which Defendants are appealing was entered 14 August 2008 in Mecklenburg County. Defendants mailed notice of appeal on 12 September 2008 to the clerk of superior court in Gaston County, who received and filed the notice of appeal on 15 September 2008. Defendants realized they had mistakenly filed their notice of appeal in the wrong county when they received a file-stamped copy of the notice of appeal from Gaston County. Defendants immediately filed their notice of appeal in Mecklenburg County on 17 September 2008.

Plaintiffs moved to dismiss Defendants' appeal on 7 January 2009 on the ground that Defendants did not file their notice of appeal in the proper place within thirty days of the entry of judgment. Plaintiffs' motion was denied on 18 February 2009. From the denial of their motion, Plaintiffs filed a separate appeal, No. COA09-1034. However, we address the timeliness of Defendants' appeal in the present case because it deals with potentially jurisdictional violations of the N.C. Rules of Appellate Procedure.

N.C.R. App. P. 3(a) provides that an appeal may be taken "by filing notice of appeal with the clerk of superior court and serving copies thereof upon all other parties within the time prescribed by subsection (c) of this rule." Rule 3(c) provides:

In civil actions and special proceedings, a party must file and serve a notice of appeal:

(1) within thirty days after entry of judgment if the party has been served with a copy of the judgment within the three day period prescribed by Rule 58 of the Rules of Civil Procedure; or

(2) within thirty days after service upon the party of a copy of the judgment if service was not made within that three day period[.]

N.C.R. App. P. 3(c). Rule 58 of the Rules of Civil Procedure provides in pertinent part:

The party designated by the judge or, if the judge does not otherwise designate, the party who prepares the judgment, shall serve a copy of the judgment upon all other parties within three days after the judgment is entered. Service and proof of service shall be in accordance with Rule 5.

N.C. Gen. Stat. § 1A-1, Rule 58 (2009). Finally, Rule 5 of the Rules of Civil Procedure provides in pertinent part:

> A certificate of service shall accompany every pleading and every paper required to be served on any party or nonparty to the litigation, except with respect to pleadings and papers whose service is governed by Rule 4. The certificate shall show the date and method of service or the date of acceptance of service and shall show the name and service address of each person upon whom the paper has been served.

N.C. Gen. Stat. § 1A-1, Rule 5(b) (2009).

The order in the present case was entered on 14 August 2008. The order was prepared by the trial court by modifying an electronic draft order provided by Plaintiffs. According to findings of fact made at the hearing on Plaintiffs' motion to dismiss the appeal, the trial court filed the order and "had copies of the order sent to each [party's] counsel." The record on appeal does not include a certificate of service.

This Court previously addressed the timeliness of an appeal pursuant to N.C.R. App. P. 3 in *Davis v. Kelly*, 147 N.C. App. 102, 554 S.E.2d 402 (2001). In *Davis*, a judgment was entered against the defendant on 24 August 2000 and served on the defendant on 1 September 2000. *Id.* at 105, 554 S.E.2d at 404. The plaintiff filed a certificate of service on 26 October 2000. *Id.* The defendant filed notice of appeal, first with this Court, but then on 10 October 2000, filed properly with the clerk of superior court in Mecklenburg County. *Id.* The plaintiff argued that, because the notice of appeal was filed more than thirty days after judgment was entered, the appeal should have been dismissed. *Id.* Our Court held:

> We note that plaintiff did not fully comply with the service requirements of Rule 58 of the Rules of Civil Procedure until 26 October 2000 since that is the date he filed a certificate of service with the court. The running of the time for filing and serving a notice of appeal was tolled pursuant to N.C.R. App. P. 3 until plaintiff's compliance, and defendant's notice of appeal is, therefore, timely. Plaintiff's motion to dismiss the appeal is denied.

*Id.*

In the present case, the record on appeal shows that Plaintiffs did not file a certificate of service of the order of 14 August 2008. Because

RICE v. COHOLAN

[205 N.C. App. 103 (2010)]

there was no certificate of service filed, the time for filing the notice of appeal was tolled. Thus, Defendants' notice of appeal filed in Mecklenburg County on 17 September 2008 was timely. Our Court, therefore, has jurisdiction to hear this appeal. *But see Huebner v. Triangle Research Collaborative*, 193 N.C. App. 420, 667 S.E.2d 309 (2008), *disc. review denied*, 363 N.C. 126, 673 S.E.2d 132 (2009).

## Plaintiffs' Cross-Assignments of Error

[2] Plaintiffs have made thirteen cross-assignments of error regarding the order denying their motion to dismiss Defendants' appeal, entered 18 February 2009. The N.C. Rules of Appellate Procedure were amended, effective 1 October 2009. Because this appeal was filed prior to 1 October 2009, we do not apply the newer version of Appellate Rule 10. Cross-assignments of error are permitted when the actions of the trial court "deprived the appellee of an alternative basis in law for supporting the *judgment, order or other determination from which appeal had been taken.*" N.C.R. App. P. 10(d) (2009) (emphasis added). Plaintiffs' cross-assignments of error concern the order denying Plaintiffs' motion to dismiss Defendants' appeal entered 18 February 2009. However, the matter before us concerns Defendants' appeal from the trial court's order granting summary judgment in favor of Plaintiffs, entered 14 August 2008. Because Plaintiffs' cross-assignments of error do not relate to an "alternative basis in law for supporting" the 14 August 2008 order, they are overruled. *See Birmingham v. H & H Home Consultants*, 189 N.C. App. 435, 444, 658 S.E.2d 513, 519 (2008).

## Standard of Review

Defendants appeal from an order granting Plaintiffs' motion for summary judgment. This Court reviews *de novo* an appeal from a trial court's order for summary judgment. *Robins v. Town of Hillsboro*, 361 N.C. 193, 196, 639 S.E.2d 421, 423 (2007) (internal citations omitted). We must "determine whether there is a 'genuine issue of material fact' and whether either party is 'entitled to judgment as a matter of law.' " *Id.* (citations omitted). In the case before us, because the facts are undisputed, we limit our review to the trial court's interpretation and application of the law.

## Defendants' First Assignment of Error

[3] Defendants contend the trial court erred by concluding that Plaintiffs could enforce the deed restrictions because there was no common development scheme. Defendants argue there was no com-

mon development scheme because (1) there was no common grantor of the lots at issue; (2) many lots contained no restrictive covenants; (3) some deeds specifically allowed for non-conforming structures; and (4) there was no master plan for setting forth restrictions. We disagree.

Our Supreme Court addressed restrictions on the use of real-property in conjunction with a general plan of development in *Sedberry v. Parsons*, 232 N.C. 707, 62 S.E.2d 88 (1950):

These principles are well settled in this jurisdiction:

1. "Where the owner of a tract of land subdivides it and sells distinct parcels thereof to separate grantees, imposing restrictions on its use pursuant to a general plan of development or improvement, such restrictions may be enforced by any grantee against any other grantee, either on the theory that there is a mutuality of covenant and consideration, or on the ground that mutual negative equitable easements are created."

2. The right to enforce the restrictions in such case is not confined to immediate purchasers from the original grantor. It may be exercised by subsequent owners who acquire lots in the subdivision covered by the general plan through *mesne* conveyances from such immediate purchasers.

3. The restrictions limiting the use of land in the subdivision embraced by the general plan can be enforced against a subsequent purchaser who takes title to the land with notice of the restrictions.

4. A purchaser of land in a subdivision is chargeable in law with notice of restrictions limiting the use of the land adopted as a part of a general plan for the development or improvement of the subdivision if such restrictions are contained in any recorded deed or other instrument in his line of title, even though they do not appear in his immediate deed.

*Sedberry*, 232 N.C. at 710-11, 62 S.E.2d at 90-91 (citations omitted).

To determine whether the restrictive covenants in the Jefferson Park deeds are enforceable by Plaintiffs against Defendants, a court must determine "whether substantially common restrictions apply to all lots of like character or similarly situated." *Id.* at 711, 62 S.E.2d at 91. In *Sedberry*, our Supreme Court held that, when a landowner divided real property into twenty-one lots and sold only eleven of

RICE v. COHOLAN

[205 N.C. App. 103 (2010)]

those lots with restrictions, there were not "substantially common restrictions" sufficient to imply a general plan of development. *Id.* at 712, 62 S.E.2d at 91.

In this case, a review of the early deeds in the Jefferson Park subdivision shows the following facts. The Blankenships purchased land from the Petrees, divided the land into eighteen lots, and sold all but four of the lots. Eleven of the lots were sold to private individuals for residential purposes. Two of the lots were sold to the MBA, for the purpose of building a church plant. Another lot was sold with a contingency allowing for use as a lake site. The deeds for the MBA lots and the lake site lot contained language subjecting those lots to the below-discussed restrictions in the event they were not used for their original purpose. Each of the deeds to the fourteen lots sold to parties outside the Blankenship family contained (1) restrictions against subdividing the property; (2) prohibitions against using the property for other than residential purposes; and (3) restrictions concerning the location, number, and architecture of buildings on the property.

The Blankenship family retained four lots. For three of those lots, two of the owners deeded their one-half interest to the other owners. Malcolm B. and Bessie Blankenship deeded their one-half interest in Lot 2, Block 1, to Mercer J. and Marjorie Blankenship. Likewise, Mercer J. and Marjorie Blankenship deeded their one-half interest in Lot 5, Block 2, and their one-half interest in Lot 9, Block 1, to Malcolm B. and Bessie Blankenship. The Blankenships deeded Lot 4, Block 2, to Ben M. and Katrina Blankenship. None of these intra-family deeds contained any restrictions. Thus, the deeds to fourteen of the eighteen lots in Jefferson Park contained the same or similar restrictions, while the deeds to four lots were not similarly restricted.

*Common Grantor*

We first address Defendants' argument that there was no common grantor to the Jefferson Park properties. The entire acreage, which would become Jefferson Park, was conveyed by the Petrees to the Blankenships in 1945. The Blankenships sold fourteen lots to purchasers outside the Blankenship family and retained four lots within the Blankenship family. Defendants direct our attention to only the three deeds that the Blankenships conveyed amongst each other.

Defendants argue that these intra-family deeds are evidence that the early deeds to the Jefferson Park lots did not share a common grantor. Defendants cite no authority for interpreting the deeds in this manner. The undisputed facts indicate that the Petrees conveyed

the Jefferson Park acreage to the Blankenships. The Blankenships then conveyed, as grantors, all but three of the lots. The remaining three lots were then disposed of in the following manner: each Blankenship couple conveyed their one-half interest in the lot in question to the other Blankenship couple. On these facts, we cannot agree with Defendant that the three intra-family deeds indicate the lack of a common grantor to the Jefferson Park lots.

## General Plan of Development

We next address the issue of whether there was a general plan of development as to the Jefferson Park lots. In *Sedberry*, our Supreme Court found no general plan of development when eleven of twenty-one lots were restricted. *Sedberry*, 232 N.C. at 712, 62 S.E.2d at 91. By contrast, the development in the case before us involves fourteen of eighteen lots in Jefferson Park being restricted, *inter alia*, to use for residential purposes. These fourteen lots were also subject to a prohibition against subdivision, combined with restrictions governing the location, number, and architecture of any buildings constructed on the lots. In light of these facts, we find that there are substantially common restrictions applicable to all lots of like character. Further, the properties were sold in accordance with a map dated 31 July 1946 and titled: "A Subdivision Plan Of A Part Of Jefferson Park Charlotte, N.C[.]" We therefore hold that the trial court correctly concluded that there was a general plan of development for the lots in Jefferson Park and that the owners of lots encumbered by the restrictive covenants could enforce those covenants against owners of similarly restricted lots. We therefore overrule Defendants' first argument.

## Termination of Restrictions Agreement

Defendants further argue that the trial court erred in determining that (1) they had not assembled the majority ownership required to terminate the restrictions by agreement and (2) that such a termination could only occur at the anniversary dates set out by the deeds.

This case arises from restrictions contained in the deeds for lots located in Jefferson Park, which precluded the owners from subdividing their property and constructing more than one residential home on each lot. The provisions in the deeds, which allow the restrictions to be terminated, differ slightly in their wording, but substantially follow this language:

These covenants are to run with the land and shall be binding on all of said parties and all parties claiming under them until

January 1st, 1975, at which time said covenants shall be automatically extended for successive periods of ten years unless by a vote of the majority of the then owners of said lots as shown on said map and it is agreed thereby to change said covenant in whole or in part.

On 5 September 2006, the owners of ten of the eighteen lots in Jefferson Park signed an agreement that "terminate[d] in their entirety any and all restrictions as may encumber the lots shown on the Recorded Map and contained in the various deeds in the chain of title and the Deeds and declare them to be of no further force and effect."

An issue before the trial court was whether the termination agreement was effective. This required a two-part inquiry: (1) whether the majority of owners could terminate the restrictive covenants in between anniversary dates; and (2) if so, what constituted a "majority of the owners" of Jefferson Park.

The trial court concluded that: (1) the majority termination is only effective on the anniversary date of the restrictions and (2) "[f]or purposes of determining·a 'majority of owners,' each owner of a lot located on the Map gets one (1) vote. In the event one individual or entity owns more than one lot, that individual or entity has only one (1) vote." The trial court set aside the Agreement and ordered that the restrictive covenants pertaining to the lots in Jefferson Park remained "in full force and effect."

### When Termination Is Permitted

Plaintiffs contend that the reference to a specific anniversary date of 1 January 1975, and automatic ten-year extension periods, require that any termination of the restrictions can be effective only on the anniversary dates.

North Carolina appellate courts have not addressed this question. Therefore, we look to cases from other states for persuasive authority. *See Skinner v. Preferred Credit*, 172 N.C. App. 407, 413, 616 S.E.2d 676, 680 (2005), *aff'd*, 361 N.C. 114, 638 S.E.2d 203 (2006).

In *Hill v. Rice*, 505 So.2d 382 (Ala. 1987), the Alabama Supreme Court addressed this issue, construing the following provision:

"(1) The restrictions herein set out shall run with the land and shall be binding upon all parties and persons claiming under them until Jan. 1, 1980, at which time said covenants and restrictions

shall automatically be extended for successive periods of ten (10) years, unless by vote of majority of the then owners of the lots it is agreed to discontinue or to change said covenants in whole or in part."

*Id.* at 383. In *Hill*, the plaintiff argued that because there was no election by a majority of the owners on or before 1 January 1980, the covenants were effective for an additional ten years, and that an agreement signed on 14 May 1985 was ineffective to remove the restrictions. *Id.* at 384. The Alabama Supreme Court held:

It is . . . well settled that restrictions on the use of land are not favored in the law, and such restrictions are strictly construed in favor of the free use of such property. . . . "Where the language of the restriction is clear and unambiguous, it will be given its manifest meaning, but its construction will not be extended by implication or include anything not plainly prohibited and all doubts and ambiguities must be resolved against the party seeking enforcement."

*Id.* (internal citation and emphasis omitted). The Alabama Supreme Court further held that the language of the covenant was not so clear and unambiguous that a majority of the lot owners could not remove the covenants prior to 1990. *Id.* "While it is clear that the restrictions were binding upon all parties and persons claiming under them until January 1, 1980, it is not clear that the intent of the covenants was that a majority of the owners could not agree to remove the restrictions after that date." *Id.* (emphasis omitted). The Court held that a different interpretation "would be inconsistent with th[e] Court's policy that restrictions on the use of land are not favored and are strictly construed in favor of the free use of property." *Id.* at 385; *contra Scholten v. Blackhawk Partners*, 909 P.2d 393, 397 (Ariz. Ct. App. 1995) (finding the analysis in *Hill* to be unpersuasive and holding that such a construction rendered the provision for ten-year extension periods meaningless).

The Courts of North Carolina have recognized the legal principles, which underpin the *Hill* decision:

" 'Covenants and agreements restricting the free use of property are strictly construed against limitations upon such use. Such restrictions will not be aided or extended by implication or enlarged by construction to affect lands not specifically described, or to grant rights to persons in whose favor it is not

clearly shown such restrictions are to apply. Doubt will be resolved in favor of the unrestricted use of property, so that where the language of a restrictive covenant is capable of two constructions, the one that limits, rather than the one which extends it, should be adopted, and that construction should be embraced which least restricts the free use of the land.

" 'Such construction in favor of the unrestricted use, however, must be reasonable. The strict rule of construction as to restrictions should not be applied in such a way as to defeat the plain and obvious purposes of a restriction.' "

*Long v. Branham,* 271 N.C. 264, 268, 156 S.E.2d 235, 239 (1967) (citation omitted).

In the case before us, there is no language in the deeds that prohibits the majority of the owners from removing the restrictions prior to one of the anniversary dates. We find the reasoning set forth in *Hill* to be persuasive and applicable to this case. The majority of the owners of Jefferson Park were not limited to terminating the restrictions on the anniversary dates and the Agreement of 5 September 2006 was effective to terminate the restrictions.

### Majority of The Owners

The next question to be determined is whether a "majority of the owners" of Jefferson Park executed the Agreement. Again, there are no North Carolina cases dealing with this issue. There is a split of authority among other states' courts as to the meaning of such language contained in a restrictive covenant.

In *Sky View Financial, Inc. v. Bellinger,* 554 N.W.2d 694 (Iowa 1996), the Court summarized the two lines of cases addressing this issue:

[T]he Association relies on a line of "one vote per owner" cases which holds that phrases like "a majority of the then owners of the lots affected thereby" or "the majority of the owners of the property" refer to voting strength measured by number of owners, not by area owned. *Cieri v. Gorton,* 179 Mont. 167, 587 P.2d 14, 17 (1978); *Beck v. Council of the City of St. Paul,* 235 Minn. 56, 50 N.W.2d 81, 82 (1951). In *Cieri,* the court rejected on equitable grounds the efforts of two nonresident owners of sixty-nine undeveloped lots to remove *all* restrictive covenants from a 110-lot subdivision over the objection of forty-one resident owners.

*Cieri*, 587 P.2d at 17. Citing *Beck*, the court framed the issue as "whether the numerical strength of those who are owners in fact is to be determined on a per capita basis or according to the amount or the number of parcels of land which they own." *Id.* (quoting *Beck*, 50 N.W.2d at 83). In both cases, the covenants revealed an emphasis on individual ownership irrespective of acreage owned, thus yielding a "one vote per owner" interpretation. *Cieri*, 587 P.2d at 17; *Beck*, 50 N.W.2d at 83.

A contrary line of cases adopts the "one vote per lot" position. In the leading "lot" case, *Diamond Bar Development Corp. v. Superior Court*, 60 Cal. App. 3d 330, 131 Cal. Rptr. 458 (1976), the owners of a majority of lots (including the developer) voted to amend protective covenants controlling perimeter fencing. Capturing the essence of the controversy, the court described the question as "whether the draftsman feared a majority tyranny based upon sheer numbers of property owners or a majority tyranny based upon extent of ownership." *Id.*, 131 Cal. Rptr. at 460. The court looked to the covenant document as a whole, finding evidence of a voting system that favored number of lots owned over mere ownership status. This scheme, the court believed, was consistent with an evident drafting intent that influence over amendments would be "commensurate with the extent of [the owners'] investment." *Id.*, 131 Cal. Rptr. at 461. Similarly, in *Cecala v. Thorley*, 764 P.2d 643, 644 (Utah App. 1988), the court found the phrase "majority of owners of lots" susceptible to two reasonable interpretations and, thus, looked to the entire agreement to discern the drafter's intent. Noting that the covenant language manifested an intent that land area ownership control the subdivision development, it rejected the *Beck* and *Cieri* analysis in favor of the "one vote per lot" interpretation in *Diamond Bar*. *Id.* at 645-46.

*Id.* at 697-98.

The rationale behind the "one vote per owner" line of cases was that "the word 'majority' refer[ed] to a quantity measured by numbers and not by area, and that the absurd result of one individual constituting a majority because he owned many tracts would occur if the latter construction were adopted." *Cieri v. Gorton*, 587 P.2d 14, 17 (Mont. 1978) (citation omitted). Conversely, the rationale behind the "one vote per lot" line of cases is that if the Court were to give one vote to each person or entity that has *some* ownership interest in a single lot, a total number of voters would be potentially

limitless and not readily ascertainable. *Cecala v. Thorley*, 764 P.2d 643, 645 (Utah App. 1988); *see also Sky View Financial, Inc.*, 554 N.W.2d at 698 (holding that the phrase "majority of the owners" meant each lot got one vote based on the reasoning that " 'it doesn't seem remotely logical or probable that the developer intended to abdicate its powers to the individual property owners once two lots, a majority of two out of three, had been sold' " because, "[c]onsistent with the covenants, the balance of control will eventually shift as more lots are sold and the developer no longer enjoys majority status") (alterations omitted)).

We hold that the "one vote per lot" cases are better reasoned and are applicable to the facts of the case before us. This is especially true in light of the fact that all of the lots of Jefferson were conveyed many years ago. In *Cecala*, the court looked at the entire document and held that the repeated use of the phrase "said lot" supported a construction of the voting rights provision that allotted one vote per lot, regardless of the number of owners of that lot. *Cecala*, 764 P.2d at 644-45. Similarly, in *Sky View Financial, Inc.*, the Court examined the amendment provision language, i.e., "[t]his Declaration may be amended by the affirmative vote of a majority of the Owners of all Lots in the Development," and held that the reference to "all Lots" would be meaningless unless all lots were considered for voting purposes. *Sky View Financial, Inc.*, 554 N.W.2d at 697-98.

In this case, the language in the deeds to the fourteen lots that allowed the restrictions to be terminated was as follows: (1) the deeds to eight lots state "by a vote of the majority of the then owners of *said lots* as shown on said map[;]" (2) the deeds to three lots state "by a vote of the majority of the then owners of *said lots* in Jefferson Park[;]" (3) the deed to one lot states "by a vote of the majority of the owners of Jefferson Park[;]" (4) the deed to one lot states "by a vote of the majority of the then owners of *lots* in Jefferson Park[;]" and (5) the last deed states "by a vote of the majority of the then owners of *this and other lots* in Jefferson Park[.]" (Emphasis added). Following the reasoning of *Cecala* and *Sky View Financial, Inc.*, we hold that the repeated use of the phrase "lots" in the provisions allowing the restrictions to be terminated, supports a construction that allocates one vote per lot owned. Because the owners of ten of the eighteen lots signed the Agreement, it was effective and the restrictions were declared "to be of no further force and effect." A majority of the owners of Jefferson Park validly terminated the restrictions in the deeds by agreement on 5 September 2006. We hold that the trial court's con-

**IN RE Y.Y.E.T.**

[205 N.C. App. 120 (2010)]

clusions were erroneous as a matter of law. We need not address Defendants' remaining arguments.

*Conclusion*

The real properties constituting Jefferson Park, as originally conveyed, were burdened by certain restrictive covenants. We hold that, because fourteen of the eighteen original lots sold were similarly burdened, there was a common development plan for the subdivision. Therefore, any owner could enforce properly preserved restrictions against any other owner similarly restricted. However, because a majority of owners agreed to terminate the restrictions, Defendants are entitled to a judgment as a matter of law. Because Defendants are entitled to a judgment as a matter of law with respect to the claims set out in the Plaintiffs' complaint, the order of the trial court is hereby reversed.

Reversed.

Judges STEELMAN and JACKSON concur.