DAVIS, Judge.
 

 *469
 
 In this appeal, we consider the circumstances under which (1) restrictive covenants demonstrate a common scheme of development within a residential subdivision; (2) changes to the character of a covenanted area can render otherwise valid restrictive covenants unenforceable; and (3) the right to enforce a restrictive covenant is waived by a failure to object to prior violations. Elford C. Dill brought this action seeking a declaratory judgment that restrictive covenants prohibiting the subdivision of certain lots in the
 
 *644
 
 neighborhood where he lived were unenforceable. The trial court entered an order concluding that the restrictive covenants at issue remain enforceable. We affirm.
 

 Factual and Procedural Background
 

 In 1945, Katherine Melton and her husband Guyton Melton acquired a 12.95-acre tract of land in Mecklenburg County. On 3 September 1953, Mrs. Melton recorded a plat map ("the Melton Map") entitled "Property of Mrs. Guy Melton" with the Mecklenburg County Register of Deeds that divided the land into seven separate lots numbered 1-7 (the "Melton Map Properties"). Lots 1-5 were subdivided for sale, Lot 6 contained Mrs. Melton's home, and Lot 7 consisted of a larger tract of undeveloped land.
 

 Over the next three years, Mrs. Melton sold Lots 1-5. All five of the lots were purchased subject to identical restrictive covenants stating that "[n]o subdivision shall be made of the herein conveyed lot." On 22 March 1963, Mrs. Melton sold Lot 6. This sale was not subject to any restrictive covenants. Lot 7, which was not encumbered by any restrictive covenants prohibiting subdivision at the time the Melton Map was recorded, was later divided by Mrs. Melton into three separate parcels for sale. Between 1960 and 1964, these parcels were conveyed subject
 
 *470
 
 to the same restrictive covenants prohibiting subdivision as those applicable to Lots 1-5.
 

 On 5 May 1977, the owners of Lot 1 conveyed a small portion of the lot consisting of .199 acres to the owner of an adjoining lot that was not depicted on the original Melton Map. That same day, the owners of the adjoining lot conveyed .046 acres of their property to the owners of Lot 1. The purpose of this exchange of land (the "Lot 1 Land Swap") was to provide the owners of the adjacent lot with sufficient land upon which to build a driveway. On 3 December 1993, Dill purchased a tract of land that encompassed the majority of Lot 1 and the entirety of Lot 2.
 

 Lot 6 was acquired by real estate developer K.V. Partners on 10 November 1999. K.V. Partners subsequently recorded a plat map with the Mecklenburg County Register of Deeds entitled "Bella Brown Preserve" in 2002. This map subdivided Lot 6 into three parcels that were subsequently purchased for residential use.
 

 On 24 June 2016, Dill filed a civil action in Mecklenburg County Superior Court against all of the other owners of lots contained on the Melton Map. The named defendants were Gerard G. Loiseau, Jennifer O. Loiseau, April B. Cottrill, Shannon L. Cottrill, Eric B. Thompson, William E. Kellar, Lori Beth Hirsberg, Geraldine C. McAlister, Shirley Beachler, Stephen Matthew Wilfong, Lisa Mayo Wilfong, Helen M. White, Lisa L. Ayers, Charles W. Ayers, and David Lee Edwards (collectively "Defendants").
 
 [1]
 
 In his complaint, Dill sought a declaratory judgment that the restrictive covenants prohibiting subdivision contained in the deeds to Lots 1-5 were invalid and unenforceable. Specifically, he alleged that (1) Mrs. Melton "failed to establish any uniform scheme of development[;]" (2) a "substantial change in usage" had occurred since the creation of the restrictive covenants; and (3) Defendants had waived their right to enforce the covenants.
 

 A bench trial was held beginning on 6 June 2017 before the Honorable Forrest D. Bridges. On 8 November 2017, the trial court entered a declaratory judgment in favor of Defendants "declaring that the subdivision restrictions ... present in the chain of title for Lots 1 and 2 of the Melton Subdivision are consistent with a common scheme of development, and therefore, these restrictive covenants are valid and enforceable[.]" Dill filed a timely notice of appeal on 5 December 2017.
 

 *471
 

 Analysis
 

 On appeal, Dill argues that (1) "the restrictive covenants pertaining to the Melton Properties failed to evidence a common or general scheme of development;" (2) even assuming a general plan of development existed at some point, it was later abandoned by Mrs. Melton;
 

 *645
 
 and (3) Defendants are estopped from enforcing the restrictive covenants against Dill by virtue of their failure to object to prior violations of the covenants. We address each argument in turn.
 

 I. General Plan of Development
 

 Dill first contends that the restrictive covenants prohibiting subdivision imposed upon the Melton Map Properties failed to establish a common plan of development. As a result, he asserts, they do not run with the land and may not be enforced against him by Defendants. We disagree.
 

 It is well established that where "an owner of a tract of land subdivides it and conveys distinct parcels to separate grantees, imposing common restrictions upon the use of each parcel pursuant to a general plan of development, the restrictions may be enforced by any grantee against any other grantee."
 
 Hawthorne v. Realty Syndicate, Inc.
 
 ,
 
 300 N.C. 660
 
 , 665,
 
 268 S.E.2d 494
 
 , 497 (1980). Restrictions imposed "under a general plan of development may be enforced against subsequent purchasers of the land who take with notice of the restriction. The test for determining whether a general plan of development exists is whether substantially common restrictions apply to all similarly situated lots."
 
 Medearis v. Trs. of Meyers Park Baptist Church
 
 ,
 
 148 N.C. App. 1
 
 , 5-6,
 
 558 S.E.2d 199
 
 , 203 (2001) (citation omitted),
 
 disc. review denied
 
 ,
 
 355 N.C. 493
 
 ,
 
 563 S.E.2d 190
 
 (2002).
 

 Our appellate courts have held that restrictions need not be imposed upon every lot in a subdivision in order to demonstrate a general scheme of development. However, a general development scheme will not be recognized where a substantial proportion of lots lack similar restrictive covenants.
 
 Compare
 

 Franklin v. Elizabeth Realty Co.
 
 ,
 
 202 N.C. 212
 
 , 217,
 
 162 S.E. 199
 
 , 201 (1932) (holding omission of restriction from single lot in subdivision did not destroy general plan of development),
 
 with
 

 Sedberry v. Parsons
 
 ,
 
 232 N.C. 707
 
 , 711-12,
 
 62 S.E.2d 88
 
 , 91 (1950) (concluding no general plan of development existed where only 11 out of 21 lots contained similar restrictions).
 

 In
 
 Rice v. Coholan
 
 ,
 
 205 N.C. App. 103
 
 ,
 
 695 S.E.2d 484
 
 ,
 
 disc. review denied
 
 ,
 
 364 N.C. 435
 
 ,
 
 702 S.E.2d 303
 
 (2010), this Court determined that
 
 *472
 
 a general plan of development existed where 14 out of 18 total lots in a subdivision "contained the same or similar restrictions, while the deeds to four lots were not similarly restricted."
 
 Id.
 
 at 113,
 
 695 S.E.2d at 491
 
 . In
 
 Rice
 
 , the four lots that were not subject to similar restrictive covenants were those retained by the family that initially owned the entire acreage that formed the basis for the subdivision.
 

 Id.
 

 We concluded that "there are substantially common restrictions applicable to all lots of like character" and that "there was a general plan of development for the lots in Jefferson Park[.]"
 
 Id.
 
 at 114,
 
 695 S.E.2d at 492
 
 .
 

 In the present case, the Melton Map was recorded in 1953 and consisted of seven lots in total. Lots 1-5 were all conveyed between 1953 and 1956 and were each subject to identical restrictive covenants prohibiting subdivision. Lot 6, which contained Mrs. Melton's home, was not subject to any restrictive covenants either at the time the Melton Map was recorded or when Mrs. Melton sold the property in 1963. Lot 7, which consisted of a large undeveloped tract of land, was similarly unencumbered by covenants at the time Lots 1-5 were conveyed. However, Lot 7 was later subdivided into three small parcels and sold between 1960 and 1964 subject to the same restrictions prohibiting subdivision as Lots 1-5.
 

 We believe our decision in
 
 Rice
 
 controls the determination of this issue in the present case. There, as discussed above, a general plan of development was found to exist where 14 out of 18 total lots in a subdivision contained "substantially common restrictions."
 

 Id.
 

 Notably, the four unrestricted lots remained in the possession of the family that owned the land prior to the creation of the subdivision. Similarly, here Lots 1-5 were all conveyed by Mrs. Melton subject to identical restrictive covenants prohibiting subdivision. As in
 
 Rice
 
 , Mrs. Melton retained ownership of the lots that were not initially subject to any restrictive covenants. Furthermore, when Lot 7 was later sold as three smaller parcels, those parcels were all conveyed subject
 
 *646
 
 to the same restrictive covenant prohibiting subdivision as Lots 1-5.
 

 Thus, we are satisfied that the trial court did not err in determining that a general plan of development existed for the Melton Map Properties. Accordingly, Dill's argument to the contrary is overruled.
 

 II. Abandonment of Intent
 

 Dill next argues "[e]ven assuming
 
 arguendo
 
 that Mrs. Melton intended to develop pursuant to a general plan, she abandoned this intent by taking actions inconsistent with any such plan." As a result, he contends, the restrictive covenants affecting the Melton Map Properties
 
 *473
 
 are no longer enforceable. In support of this proposition, he directs our attention to the Lot 1 Land Swap and the fact that Lots 6 and 7 were subsequently subdivided following the sale of Lots 1-5.
 

 This Court has held that otherwise valid restrictive covenants may "be terminated when changes within the covenanted area are so radical as practically to destroy the essential objects and purposes of the agreement."
 
 Medearis
 
 ,
 
 148 N.C. App. at 6
 
 ,
 
 558 S.E.2d at 203
 
 (citation and quotation marks omitted).
 

 Where a residential subdivision is laid out according to a general scheme or plan and all the lots sold or retained therein are subject to restrictive covenants, and the value of such development to a large extent rests upon the assurance given purchasers that they may rely upon the fact that the privacy of their homes will not be invaded by the encroachment of business, and that the essential residential nature of the property will not be destroyed, the courts will enforce the restrictions and will not permit them to be destroyed by slight departures from the original plan.
 

 On the other hand, when there is a general scheme for the benefit of the purchasers in a development, and then, either by permission or acquiescence, or by a long chain of violations, the property becomes so substantially changed that the whole character of the subdivision has been altered so that the whole objective for which the restrictive covenants were originally entered into must be considered at an end, then the courts will not enforce such restrictive covenants.
 

 Logan v. Sprinkle
 
 ,
 
 256 N.C. 41
 
 , 47,
 
 123 S.E.2d 209
 
 , 213 (1961) (internal citations omitted). Our Supreme Court has stated that "[w]hether the growth and general development of an area represents such a substantial departure from the purposes of its original plan as equitably to warrant removal of restrictions formerly imposed is a matter to be decided in light of the specific circumstances of each case."
 
 Hawthorne
 
 ,
 
 300 N.C. at 667
 
 ,
 
 268 S.E.2d at 499
 
 .
 

 It is well established that violations of restrictive covenants must be substantial in order to constitute the type of radical change sufficient to render the covenants unenforceable. For example, in
 
 Hawthorne
 
 a public library was constructed and a branch bank office opened within a subdivision in violation of a covenant restricting the property
 
 *474
 
 to residential uses.
 
 Id.
 
 at 668,
 
 268 S.E.2d at 499
 
 . Our Supreme Court held that these violations did not constitute a radical change, concluding that "the library and the ... bank office represent no more than minor intrusions upon the quiet enjoyment of an area otherwise residential in nature."
 
 Id.
 
 at 668-69,
 
 268 S.E.2d at
 
 500 ;
 
 see also
 

 Tull v. Doctors Bldg., Inc.
 
 ,
 
 255 N.C. 23
 
 , 39-40,
 
 120 S.E.2d 817
 
 , 828 (1961) (use of six lots in a residential subdivision as parking space for an office building was not "such a radical or fundamental change or substantial subversion as practically to destroy the essential objects and purposes of the restriction agreement");
 
 Williamson v. Pope
 
 ,
 
 60 N.C. App. 539
 
 , 544,
 
 299 S.E.2d 661
 
 , 664 (1983) (residential covenant remained enforceable despite fact that 11 out of 69 blocks were used for commercial purposes).
 

 Conversely, in
 
 Medearis
 
 this Court held that a radical change had, in fact, rendered a residential restriction unenforceable where six out of twelve lots were used for commercial purposes, four were vacant, and only one lot currently contained a residential structure.
 
 Medearis
 
 ,
 
 148 N.C. App. at 9
 
 ,
 
 558 S.E.2d at 205
 
 . In that case, we concluded that "the changes have destroyed the uniformity of the plan and the equal protection of
 
 *647
 
 the restriction."
 

 Id.
 

 (citation and quotation marks omitted).
 

 In determining whether the Melton subdivision has undergone a radical change since the recordation of the Melton Map, we first examine the Lot 1 Land Swap. As noted above, the land swap was undertaken to provide the owners of property adjacent to Lot 1 with sufficient space to build a driveway. In its findings of fact, the trial court found that the parcel totaled .199 acres and "consisted of a long, thin strip of land that proceeds along Rosemary Lane to Sharon Hills Road. No structures have been constructed on the Lot 1 Land Swap property."
 

 Thus, although the Lot 1 Land Swap constituted a technical violation of the restriction against subdivision, it ultimately had little to no impact upon the character of the neighborhood. Accordingly, the trial court correctly determined that the Lot 1 Land Swap did not "have any substantial change upon the character of the subdivision[.]"
 

 With regard to the subdivision of Lots 6 and 7, we observe that no restrictive covenants were ever placed upon Lot 6. Furthermore, while Lot 6 was ultimately subdivided into three smaller parcels, those parcels were intended for residential use. Although Lot 7 originally consisted of an unencumbered tract of undeveloped land, it was later divided by Mrs. Melton into three smaller residential lots. These lots were conveyed subject to restrictive covenants prohibiting their subdivision identical to those applicable to Lots 1-5.
 

 *475
 
 Based upon our thorough review of the record and applicable case law from our appellate courts, we are unable to agree with Dill's contention that the subdivision of these lots constituted a change radical enough "as practically to destroy the essential objects and purposes of the scheme of development."
 
 Williams v. Paley
 
 ,
 
 114 N.C. App. 571
 
 , 578,
 
 442 S.E.2d 558
 
 , 562 (1994) (citation and quotation marks omitted). If anything, these changes arguably served to reinforce the original purpose of Melton's scheme of development. We hold that the trial court did not err in determining the actions relied upon by Dill did not have the effect of invalidating the covenants at issue.
 

 III. Waiver of Right to Enforce Covenants
 

 In his final argument, Dill contends that Defendants have waived their right to enforce the subdivision restriction against him by their failure to object to "numerous prior subdivisions within the Melton Properties." Once again, he cites the Lot 1 Land Swap and the subdivisions of Lots 6 and 7 as support for this argument.
 

 "A waiver may be express or implied."
 
 Medearis
 
 ,
 
 148 N.C. App. at 11
 
 ,
 
 558 S.E.2d at 206
 
 (citation omitted). A waiver is implied "when a person dispenses with a right by conduct which naturally and justly leads the other party to believe that he has so dispensed with the right."
 
 Id.
 
 at 12,
 
 558 S.E.2d at 206-07
 
 (citation and quotation marks omitted). This Court has held that "[a]n acquiescence in a violation of restrictive covenants does not amount to a waiver of the right to enforce the restrictions unless changed conditions within the covenanted area are so radical as practically to destroy the essential objects and purposes of the scheme of development."
 
 Williams
 
 ,
 
 114 N.C. App. at 578
 
 ,
 
 442 S.E.2d at 562
 
 (citation and quotation marks omitted).
 

 As an initial matter, we observe that neither Lot 6 nor Lot 7 was subject to a restriction against subdivision at the time of the recordation of the Melton Map. Thus, Defendants could not have waived their right to object to the subdivision of Lots 6 and 7 because they never possessed such a right in the first place. Moreover, our conclusion that the Lot 1 Land Swap did not constitute a change so radical as to effectively destroy the essential purposes of the development scheme applies with equal force to Dill's waiver argument.
 
 See
 

 Williamson
 
 ,
 
 60 N.C. App. at 544
 
 ,
 
 299 S.E.2d at 664
 
 (holding that failure to object to minor violation of restrictive covenant did not waive "right to enforce the covenant against ... a much more radical departure from the permitted use"). Accordingly, we conclude the trial court did not err in ruling that Dill has
 
 *476
 
 failed to show Defendants waived their right to enforce the
 
 *648
 
 subdivision restrictions against him.
 
 [2]
 

 Conclusion
 

 For the reasons stated above, we affirm the trial court's 8 November 2017 order.
 

 AFFIRMED.
 

 Judges HUNTER, JR. and MURPHY concur.
 

 [1]
 

 Dill later voluntarily dismissed his claims against Lisa Ayers, Charles Ayers, Helen White, and Eric Thompson.
 

 [2]
 

 Dill also argues that the trial court's 8 November 2017 order contained several findings of fact that were unsupported by evidence of record. Based on our careful review of the record, we are satisfied that even assuming
 
 arguendo
 
 portions of the court's findings were erroneous, any such error was harmless.
 
 See
 

 In re E.M.
 
 , --- N.C. App. ----, ----,
 
 790 S.E.2d 863
 
 , 869 (2016) ("[T]he inclusion of an erroneous finding of fact is not reversible error where the court's other factual findings support its determination." (citation omitted) ).