Action to compel specific performance of a contract of purchase and sale of real property.
Plaintiff, being the owner of lot No. 13, block 4, West Highlands No. 1, in Winston-Salem, N.C. contracted to sell the same to defendant "free and clear of . . . any and all restrictions as to the use of the property for building purposes, the said party of the second part anticipating and planning to use the said property for business purposes only, and no other." The defendant refused to comply for that one of plaintiff's predecessors in title, by covenant contained in a deed to the premises, restricted the use of said property to residential purposes.
The plaintiff thereupon instituted this action to compel defendant to comply. The defendant, answering, pleaded the restrictive covenant running with the land contained in one of the deeds in plaintiff's chain of title as a breach of the conditions of the contract. Plaintiff, replying, alleged that the said covenant was not inserted in said deed pursuant to any general plan or scheme of development in a manner to be binding upon the grantor and his other grantees; that even if it was so inserted, *Page 428 
conditions have so changed as to make it inequitable and unjust to now enforce it. He prays that the court decree that the covenant is now null and void and of no effect and that defendant be required to comply with his contract. He sets forth fully the facts upon which he bases this plea.
When the cause came on for hearing the parties waived trial by jury and agreed that the court should hear the evidence, find the facts, and render its judgment thereon.
After hearing the evidence, the court found the facts as follows:
"1. That prior to the development of the property in which the lot at the corner of First and Hawthorne Road, in the City of Winston-Salem, was developed one, P. H. Hanes, owned the property on both the north and south sides of First Street a considerable distance east and west thereof at Hawthorne Road; that he also owned all of the property on both sides of Hawthorne Road, to-wit, the east and west sides, and for a considerable distance therefrom, north and south; that he later formed a corporation known as the West End Development Company, in which he or the immediate members of his family owned all of the stock and transferred the title to all of the property near this intersection and for a considerable distance therefrom to said corporation; that they attempted to limit the development of most of the property sold by them in the block in which the property in question is located, by inserting a limitation or restriction in most of the deeds that the lot be used for residences only but conveyed one lot without this restriction and did not covenant that the land or lots retained would be so restricted; that to the east of this lot across Hawthorne Road it sold a large site to the Gulf Oil Company, to be used by them as a filling station and the said property is used as a filling station as of this date; that it sold to the Pure Oil Company a large lot immediately across First Street from this property for the purpose of erecting thereon a filling station and the said company did erect thereon a filling station and that the said filling station is now used as such; that cater cornered across from the lot in question at the southeast corner of First Street and Hawthorne Road the West End Development Company erected a large block of stores which are now rented for grocery stores, drug stores, restaurants, barber shops and similar types of establishments; that after the death of the said P. H. Hanes, the West End Development Company's stock was inherited by the children of the said P. H. Hanes; that later the West End Development Company was dissolved and all of the real estate consisting of vast acreage and lots was transferred by the West End Development Company to a Trustee for the heirs of P. H. Hanes; that in recent years the said Trustee has erected and leased to the A. P. Tea Company a large supermarket on a lot across First Street to the west of the lot in question and they have erected on the remainder of the lot and adjacent to the supermarket *Page 429 
a large lot for parking space for the patrons of the said A. P. Market; that later a filling station was erected for the use of the Standard Oil Company and rented to said Company or some person designated by said Company, and the filling station is now used for that purpose; that by reason of these sales and developments by P. H. Hanes or the closed corporation of P. H. Hanes, the West End Development Company, and/or the Trustees of the heirs of P. H. Hanes, the Court finds as a fact that there has been no general plan of development concerning the lot in question and by reason of the said failure of a general plan of development the restrictions contained in the deed to one of the plaintiff's predecessors in title restricting the use of the said property for residential purposes only, is null and void and of no effect.
"The Court further finds as a fact from the evidence adduced at the trial of this cause that even if a general plan of development was intended for the block in which the lot involved in this suit was located, great changes have occurred in the vicinity rendering the property wholly unfit for residential purposes; that a filling station has been built immediately across Hawthorne Road to the south of the lot and is now maintained by the Gulf Oil Company, as a super filling station, being used by hundreds of cars a day and from which emits the noises usually occurring around such a filling station; that a filling station has been built by the Pure Oil Company across First Street from the lot, to the south, and a large filling station is now maintained there and is used by a great number of patrons and from which emits noises incident to the operation of such a place of business; that very recently a filling station has been erected immediately to the west of the Pure Oil Company's station and across First Street to the south from the lot in question, used by the Standard Oil Company and this station is patronized by a large number of persons and from it emits noises incident to the operation of such a business; that cater cornered off First and Hawthorne Streets, to the southeast from the lot in question is a large block of stores containing one or more grocery stores, a drug store, restaurant and similar places of business, which block of businesses extends entirely up Hawthorne Road to the south from the intersection of First Street for an entire block; that also located in this block is an additional drug store, grocery store, two super markets and a beauty parlor, all of which are patronized by a large number of people and from them emits the usual noises and odors incidental to the operation of such business places; that across First Street to the west of this lot has been erected a large super A. P. Market, patronized by probably the largest number of patrons of any store in the City of Winston-Salem; that there is a large parking lot operated in connection with this business and there is a tremendous amount of parking on the streets by this lot and other places adjacent *Page 430 
thereto, by the patrons of this market; that emitting from this place of business are the noises of the traffic, odors, and other things incidental to the operation of the said business; that this lot juts out as a form into probably the busiest intersection in the City of Winston-Salem; that to the south of this intersection is the residential area known as Ardmore, in which live approximately 15,000 persons and by this intersection goes the traffic into the only two main entries or arteries of traffic into this large subdivision; that located to the north of this lot is a large Grammar School and the R. J. Reynolds High School, the largest high school in the City of Winston-Salem and across this intersection goes a large amount of the traffic headed towards the Mocksville Highway, to the southwest, and to the Country Club to the west, both leading to large residential areas and carrying a large amount of traffic; that by reason of this traffic on both sides of the said lot, it is highly undesirable as a residential lot; that the lot as a residential lot is worth less than the amount of the street assessments, to-wit, $1,300.00; that as a business lot it is worth more than $20,000; that by reason of the changes that have taken place in the area as to the establishment of business property and the tremendous increase of traffic on both streets, on both sides of this property, the lot in question has been rendered wholly unfit for residential purposes and the changes in the use of the property in the vicinity have been so radical as to destroy the essential objects and purposes of the agreement to use the said property for residential purposes only; that in fact the said property has become business property instead of residential property and it will be highly inequitable to enforce the residential restrictions on the use of this property; also by reason of the fundamental changes in the character of the community the residential restrictions in the deed from one of the plaintiff's grantors, which purports to run with the property, has made the restrictions unenforceable and it would be inequitable and unjust to attach the restrictions to the use of the said property."
In thereupon decreed "that the restrictions purporting to run with the land in a deed to one of the plaintiff's predecessors in title, limiting the use to residences only, is declared null and void and of no effect, and the defendant be, and is hereby required to accept a deed from the plaintiff to the property, and is directed to execute to the plaintiff a deed in fee simple to the farm in Stokes County to pay the stipulated down payment of $2,000.00 and to execute a note secured by a deed of trust under the terms of the contract for the remaining $18,000."
Defendant excepted and appealed.
The servitude imposed by restrictive covenants is a species of incorporeal right. It restrains the owner of the servient estate from making certain use of his property. Turner v. Glenn, 220 N.C. 620, and cases cited; 14 Am. Jur., 608-09. Such right or interest reserved in a conveyance will be effective as against all who deraign title through the grantee, although the reservation is not expressed in subsequent deeds. 16 Am. Jur., 611.
The courts have generally sustained covenants restricting the use of property where reasonable, not contrary to public policy, not in restraint of trade and not for the purpose of creating a monopoly — and building restrictions have never been regarded as impolitic. So long as the beneficial enjoyment of the estate is not materially impaired and the public good and interest are not violated such restrictions are valid. Subject to these limitations the court will enforce its restrictions and prohibitions to the same extent that it would lend judicial sanction to any other valid contractual relationship. 14 Am. Jur., 616. Hence, the restriction is not void ab initio. If conditions have arisen or circumstances have developed which make the enforcement thereof inequitable and unjust, 14 Am. Jur., 615, the burden of so showing rests upon him who seeks its annulment. Until he has so shown the restriction is binding and effective.
A person owning a body of land, and selling a portion thereof, may, for the benefit of his remaining land, impose upon the land granted any restrictions not against public policy that he sees fit. 7 R. C. L., 1114. In the absence of a general plan of subdivision, development and sale subject to restrictions, the restriction limiting the use of the portion sold is deemed to be personal to the grantor and for the benefit of the land retained. Ordinarily, it is only when the subdivided property is conveyed by deeds containing uniform restrictions in accord with a general scheme and for the benefit of all within a specified area that the other grantees of the owner of the original tract may enforce the restriction.
There is evidence here that the grantor or its successor still owns a part of the original tract. It also appears that all the lots, save one, in the block in which plaintiff's lot is located were sold subject to similar restrictions. Hence, there is some evidence that plaintiff acquired title under a general scheme or at least tending to show that other grantees of the original grantor may be interested in attempting to so prove. It follows that the original grantor is, and its other grantees may be, interested in the enforcement of the covenant plaintiff seeks to annul.
The judgment herein is not conclusive as to any one other than plaintiff and defendant. Plaintiff's predecessor in title and those who may claim that the covenant was inserted pursuant to a general plan or scheme of development are not estopped from hereafter asserting their *Page 432 
rights thereunder. Under such circumstances equity will not require defendant to comply with his contract in direct violation of the stipulation that the property is to be conveyed free of restrictive covenants. If plaintiff desires to have this covenant invalidated and stricken from the deed of the original grantee, he must bring in the interested parties and give them a day in court.
We are not inadvertent to Elrod v. Phillips, 214 N.C. 472,199 S.E. 722, relied on by plaintiff. We do not consider that it is controlling on the question here discussed and decided. See Brenizerv. Stephens, 220 N.C. 395, and Turner v. Glenn, supra.
Since the cause must be remanded for new parties and a further hearing, we refrain from a full discussion either of the evidence or of the law of the case.
Error and remanded.