IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-633

Filed 7 May 2025

Rockingham County, No. 23 CVS 000254-780

KENNETH W. PREVETTE, JR. and CAROLL P. PREVETTE, Plaintiffs,

v.

THOMAS ELSNER and JOHANNA ELSNER, Defendants.

Appeal by Defendants from order entered 29 January 2024 by Judge David L. Hall in Rockingham County Superior Court. Heard in the Court of Appeals 29 January 2025.

*Higgins Benjamin, PLLC, by Attorney John F. Bloss, for Plaintiffs–Appellees.*

*Bell, David & Pitt, PA, by Attorneys Bradley C. Friesen & Carson D. Schneider, for Defendants–Appellants.*

MURRY, Judge.

Thomas and Johanna Elsner (Defendants) appeal from an order granting Kenneth and Caroll Prevette's (Plaintiffs) motion for summary judgment. Defendants argue that Plaintiffs lack standing to pursue this cause of action, and thus, the trial court lacked subject-matter jurisdiction to grant their motion for summary judgment. For the reasons below, this Court agrees with Defendants and vacates the trial court's judgment.

## I.    Background

Since the 1990s, Paul and Sharon Knight have owned and resided on land located at 645 Troublesome Road in Reidsville, North Carolina (Knights' Property). The Knights' Property is now 27.48 acres but once totaled approximately 54 acres (Original Property). The Original Property consisted of two larger tracts: a 5-acre tract (Northern Tract) and a 49.085-tract southeast of the Northern Tract (Southern Tract).[1] On 6 April 2021, the Knights recorded a plat combining the Northern Tract with a portion of the Southern Tract (April 2021 Plat), creating a 7.742-acre tract (April 2021 Tract). The April 2021 Plat indicates that the Knights own the property adjacent to the April 2021 Tract but does not depict it. The Knights' Property consists of the April 2021 Tract and the remainder of the Southern Tract. The April 2021 Plat does not indicate any restrictions on the Knights' Property.

In 2021, Plaintiffs decided to purchase a portion of the Knights' Property to build a home. Before doing so, the Knights provided Plaintiffs with a list of the restrictive covenants they would later include in Plaintiffs' deed. On 28 June 2021, the Knights recorded a survey plat creating a 7.004-acre tract (Plaintiffs' Tract) within the Knights' Property, titled "Survey Plat for Kenneth W. Prevette and wife

---

[1] On 13 December 1995, Paul Knight received a deed (1995 Deed) for the Northern Tract. The 1995 Deed does not contain any restrictions on the Northern Tract. On 7 January 1999, the Knights acquired the Southern Tract. The Knights recorded a survey plat of the Southern Tract (January 1999 Plat) and referenced it as the property description in the deed (January 1999 Deed). The January 1999 Plat indicates that Paul Knight owns the Northern Tract adjacent to the Sothern Tract but does not depict the Northern Tract beyond showing its boundary with dashed lines. The January 1999 Deed does not include any restrictions on the Southern Tract.

Caroll P. Prevette" (Plaintiffs' Plat). Plaintiffs' deed would later reference Plaintiffs' Plat as its property description. Plaintiffs' Plat indicates that Plaintiffs' Tract is surrounded on all sides by the Knights' Property, excluding road frontage. Plaintiffs' Plat does not plat the Knight Property together with the Plaintiffs' Tract, depict any other subdivided lots, or indicate any restrictions on the Plaintiffs' Tract. The Knights would later place restrictions on the Plaintiffs' Tract. On 27 August 2021, Plaintiffs purchased Plaintiffs' Tract (Plaintiffs Property).[2] Plaintiffs' purchasing deed states the following restrictions:

> [N]o mobile homes . . . [may] be placed on the real property[;] no residential structure [may] be l[e]ss than 1500 sq. f[ee]t[;] no unlicensed vehicles . . . [are] allowed . . . on the real property[;] the siding of an[y] additional structure should match the shell of the residential structure[;] no burning of trash [is] . . . permitted[;] the burning of yard waste and fire wood [is] . . . permitted within a suitable fire pit.

Sometime in 2022, Defendants approached the Knights about purchasing the April 2021 Tract (First Tract). At some point, the Knights "removed three mobile homes" from their property. On 12 April 2022, the Knights conveyed First Tract to Defendants. Defendants' deed included the same restrictions as in Plaintiffs' deed. On 28 April 2022, the Knights recorded a new survey plat in the Rockingham County Register of Deeds for a new 3.095-acre tract east of Plaintiffs' Property between First

---

[2] Prior to conveying to Plaintiffs on 27 August 2021, the Knights had never conveyed any portion of their Original Property. After conveying to Plaintiffs, all of the remaining Original Property remained unrestricted, including the land that the Knights would later restrict upon conveying to Defendants. As of August 2021, there were only three survey plats of record: the 1999 Plat, the April 2021 Plat, and the June 2021 Plat—none of which mentioned any restrictions.

Tract and the remaining portion of the Knights' Property (Second Tract). On 20 May 2022, the Knights conveyed Second Tract to Defendants. Unlike Defendant's first deed, Defendants' second deed did not include any restrictions. On 8 September 2022, Defendants recorded a plat combining First and Second Tracts, resulting in a total lot size of 10.837 acres (Defendants' Property). The record does not indicate that the Knights placed restrictions on any other portion of the Knights' Property.

Sometime thereafter, Defendants opened a recreational vehicle (RV) park on their land called "Little Birds Tiny Farm." On 9 February 2023, Plaintiffs sued to enjoin the park's operation, alleging that it violates the restrictive covenants. Plaintiffs filed motions for a preliminary injunction and summary judgment in their favor, which the trial court granted on 30 August and 2 February 2024, respectively. Defendants timely appealed both on 1 March 2024.

## II. Jurisdictional Analysis

Plaintiffs substantively argue that Defendants violate the restrictive covenants by operating their RV park on Defendants' Property. Before reaching these merits, however, we must first determine whether Plaintiffs have standing to bring this action because "substantive issues cannot be addressed unless the[y] . . . ha[ve] the capacity to do so." *Beech Mtn. Prop. Owners' Ass'n v. Current*, 35 N.C. App. 135, 136 (1978). Defendants argue as much. This Court agrees with Defendants and vacates the trial court's orders on that ground.

### A. Third-Party Standing

We review *de novo* questions of jurisdictional standing "to make a legal claim or seek judicial enforcement of a duty or right," *Fearrington v. City of Greenville*, 386 N.C. 38, 45 (2024) (quoting *Comm. to Elect Dan Forest v. Emps. PAC*, 376 N.C. 558, 564 (2021)), which may be raised at any time in the litigation process, *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368 (2013). To assert standing, a party must have "a sufficient stake in an otherwise justiciable controversy so as to properly seek adjudication of the matter." *Woodring v. Swieter*, 180 N.C. App. 362, 366 (2007). Standing is a threshold matter and "necessary prerequisite to the court's proper exercise of subject[-]matter jurisdiction." *Creek Pointe HOA v. Happ*, 146 N.C. App. 159, 164 (2001). "[T]he party invoking jurisdiction . . . ha[s] the burden of proving the elements of standing," *Blinson v. State*, 186 N.C. App. 328, 333 (2007)—here, those of third-party standing.

North Carolina's common law allows a property owner to sell his land subject to any restrictions "that he sees fit," so long as they do not contradict public policy. *Sheets v. Dillon*, 221 N.C. 426, 431 (1942) (citing 7 R.C.L. *Restrictive Covenants* § 30 (1929)). These restrictions are often included in the conveyance "as either personal . . . or real covenants that . . . run with the land." *Runyon v. Paley*, 331 N.C. 293, 299 (1992). A real covenant "creates a servitude upon the land subject to the covenant (the servient estate) for the benefit of another parcel of land (the dominant estate)." *Cummings v. Dosam, Inc.*, 273 N.C. 28, 32 (1968). The dominant estate may enforce restrictive covenants against the servient estate regardless of "whether [or not]

the[ir] owners are the original covenant[ors] . . . or successors in interest." *Runyon*, 331 N.C. at 299.

In keeping with these larger principles, our courts recognize instances where third parties may enforce restrictive covenants if they have standing "in law or equity" to do so. *McCrann*, 225 N.C. App. at 372. As third parties seeking enforcement, Plaintiffs "assume[ ] the burden of showing" they have standing by demonstrating that the restriction is "enforceable by another grantee." *Beech Mtn.*, 35 N.C. App. at 137. Because restrictive covenants hinder "the free and unfettered use of land," however, we have long favored their "strict[ ] constru[ction] so as not to broaden the limitation on the use." *Reed v. Elmore*, 246 N.C. 221, 224 (1957). We similarly apply "[t]his rule of strict construction" to the threshold issue of Plaintiffs' purported standing. *Sleepy Creek Club, Inc. v. Lawrence*, 29 N.C. App. at 553 (1976) This canon resolves "all ambiguities" in restrictive covenants in "favor of unrestrained" land use. *Steiner v. Windrow Ests. HOA*, 213 N.C. 454, 457 (2011).

In the case *sub judice*, Plaintiffs do not own the dominant estate; they are instead "strangers to the contract" that contains the restrictions they seek to enforce. *Lawrence*, 29 N.C. App. at 553. To enforce these restrictions as third parties under North Carolina common law, Plaintiffs must establish, in relevant part, either (1) contractual privity to a covenant at law or (2) the covenantors' original intent that Plaintiffs benefit as successors in interest to an equitable servitude. *See Runyon*, 331 N.C. at 299. If the former, Plaintiffs must show that the covenant's mutual burdens

and benefits to both Properties "touch and concern [those] land[s]." *Id.* at 310. If the latter, however, Plaintiffs need only show that the restrictive "burden touches and concerns" Defendant's Property. *Id.*

## B. Real Covenant

Real covenants at law "rest[ ] squarely upon the terms and conditions of the contract being set out in grantee's chain of title.*" Reed*, 246 N.C. at 235. A restrictive covenant is a type of:

> Real covenant that runs with the land of the dominant and servient estates only if (1) the subject of the covenant touches and concerns the land, (2) there is privity of estate between the party enforcing the covenant and the party against whom the covenant is being enforced, and (3) the original covenanting parties intended the benefits and burdens of the covenant to run with the land.

*Runyon*, 331 N.C. at 299–300.

### 1. Touch & Concern Land

A covenant need not have a physical effect on the land to touch and concern it; rather, "[i]t is sufficient that the covenant have some economic impact on the parties' ownership rights." *Id.* at 300. In essence, the covenant must "affect the legal rights of the covenanting parties as landowners." *Id.* We recognize that a restriction "limiting the use of land clearly touches and concerns the estate burdened with the covenant because it restricts the owner's use and enjoyment of the property and thus affects [its] value." *Id.* at 301 ("[T]he nature of the restrictive covenants at issue in this case

(building or use restrictions) is strong evidence that the covenants touch and concern the dominant and servient estates.").

## 2. *Privity of Estate*

Where the parties lack the contractual privity ordinarily required to enforce a contract, this Court accepts privity of estate "as a substitute for privity of contract." *Runyon*, 331 N.C. at 301–02. To show privity of estate, we "adhere to the rule that a party seeking to enforce a covenant as one running with the land at law must show the presence of both horizontal and vertical privity." *Id.* at 303. Horizonal privity is the "privity of estate between covenantor and covenantee at the time the covenant was created" and can be shown with "some 'connection of interest' between the original covenanting parties, such as, here, the conveyance of an estate in land." *Id.* (citing Restatement (First) of Property § 534 (Am. L. Inst. 1944)). Vertical privity is the "privity of estate between the covenanting parties and their successors in interest" and can be shown by a "succession of interest between the original covenanting parties and the current owners of the dominant and servient estates." *Id.*

## 3. *Intent of Parties*

Land-use restrictions "create a personal obligation or impose a servitude upon the land enforceable by" third parties as determined "by the intention of the parties at the time the deed containing the restriction was delivered." *Stegall v. Housing Auth. of Charlotte*, 278 N.C. 95, 100 (1971). The question of the original parties' intent

"is one that the court must decide by applying our well-established principles of contract construction." *Runyon*, 331 N.C. at 305. It "must be ascertained from the deed itself, but when the language used is ambiguous it is proper to consider the situation of the parties and the circumstances surrounding their transaction." *Stegall*, 278 N.C. at 100. An instrument could be intended to benefit a party who is not expressly mentioned in the language of conveyance. *See, e.g.*, *Reed*, 246 N.C. at 221 (holding that a covenant was intended to benefit a party not mentioned in the restriction). Intent to benefit "may not be established by parol." *Stegall*, 278 N.C. at 100. Affidavits about the parties' intent are "inadmissible parol evidence to add or vary the terms of the instrument" and "[in]competent evidence" to satisfy the intent requirement. *Runyon*, 331 N.C. at 311.

Plaintiffs cannot enforce the restrictions as a real covenant at law because they fail to adequately specify an argument on those grounds. Plaintiffs argue that "the Knights' conveyances impose mutual restrictive servitudes on Plaintiffs' and Defendants' tracts, enforceable by either of them" and that, "alternatively, Plaintiffs are entitled to enforce the covenants against Defendants as an equitable servitude." This language alludes to a claim of covenants at law; however, Plaintiffs' argument entangles the two pathways for standing. Asserting that a conveyance imposed "mutual restrictive servitudes" to preserve the "uniformity of conditions imposed with respect to a given area" indicates an equitable servitude, not a covenant at law. *See Sedberry v. Parsons*, 232 N.C. 707, 711 (1950). Thus, while Plaintiffs may have

intended to allege that they had standing to enforce the deed restrictions as covenants at law, they failed to do so in accordance with established legal precedent.

Plaintiffs also do not adequately address the issue of the required privity to enforce a covenant at law. Contrary to their assertion, they are not "original grantees of the deed[ ] containing the restriction[ ]" applicable to Defendants' Property. They instead focus on whether the Knights intended to impose the restrictions that benefit Plaintiffs and Defendants and are enforceable by both of them. *Runyon,* 331 N.C. at 309. This is further evidence that Plaintiffs base their standing on the theory of equitable servitude alone. Thus, any indication that Plaintiffs intended to argue that the restrictions may be enforced as covenants at law is hereby abandoned. *See* N.C. R. App. P. 28(a) ("Issues not presented and discussed in a party's brief are deemed abandoned."). We limit our review to whether Plaintiffs have standing to enforce the covenants as equitable servitude.

## C. Equitable Servitude

A covenant unenforceable by law may "be binding in equity, even to the extent of fastening a servitude." *Runyon*, 331 N.C. at 309. A party seeking to enforce a real covenant as an equitable servitude must show "(1) that the covenant touches and concerns the land, and (2) that the original covenanting parties intended the covenant to bind the person against whom enforcement is sought and to benefit the person seeking to enforce the covenant." *Id.* at 310.

### 1. Touch & Concern Land

- 10 -

Under the theory of equitable servitude, we apply the same analysis to whether a covenant "is of such a *character* that it touches and concerns the land" as we do to a covenant at law. *Id.* at 309. Plaintiffs must also show the covenant "affects [both] the dominant estate" and their own land due to its "close proximity." *Id.* Here, the restriction at least runs with the land because Defendants' restrictions clearly limit the use of their land and affect Plaintiffs' land due to their close proximity. *Id.* at 301.

## 2. *Intent of Parties*

As nonparties to the original covenant, though, Plaintiffs also "must show that the original covenanting parties intended that the covenant bind" Defendants against them. *Id.* at 311. Our courts generally presume that only the original covenanting parties may enforce covenants, *Stegall*, 278 N.C. at 101, but a plaintiff may rebut this presumption with evidence that "(1) the covenanting parties intended that the covenant personally benefit the party seeking enforcement, or (2) the covenanting parties intended that the covenant benefit property in which the party seeking enforcement holds a present interest." *Runyon*, 331 N.C. 293, 311. Evidentiary intent includes a common scheme of development*, see Higdon v. Jaffa*, 231 N.C. 242, 247 (1949), a succession of interest retained by the covenantee, *see Sheets*, 221 N.C. at 431, or the covenantor's stated intent to *specifically* benefit the property owned by a complainant, *see Lamica v. Gerdes*, 270 N.C. 85, 89–90 (1967). For any of the above, intent "may not be established by parol," *Stegall*, 278 N.C. at 100, which includes affidavits about the parties' intent, *Runyon*, 331 N.C. at 311.

- 11 -

Here, the Plaintiffs are not "successors in interest" because they are not parties to the original covenants that they want to enforce. To meet this element, Plaintiffs would have to "succeed" to the interest created by the Knights' benefitted estate. But that interest did not exist until 12 April 2022, when the Knights conveyed the Defendants' First Tract subject to restrictions creating the dominant and servient estates. *See Sheets*, 221 N.C. at 431 (holding that plaintiff had standing because a "right or interest reserved in a conveyance . . . [is] effective . . .against all who deraign title through the grantee"). The restrictions also lack any express statement of intent to benefit Plaintiff's property. *See Lamica*, 270 N.C. at 90 (holding that plaintiffs had standing because developer "clearly and distinctly expressed an intention to impose the restrictions on the land[ ] and to allow any[one] . . . owning any real property . . . to enforce the[m] . . . *inter se*").

Because Plaintiffs fail to meet the first two enforcement grounds, we focus on whether the evidence indicates a common scheme of development. In this case, "substantially common restrictions" must "apply to all similarly situated lots." *Dill v. Loiseau*, 263 N.C. App. 468, 471 (2019). A plaintiff must show "proof of a general plan or scheme for the improvement of property," "covenants . . . entered into as part of [that] general plan," and "reference to [that] . . . plan or scheme a[s] the covenant . . . entered into the consideration of his purchase." *Humphrey v. Beall*, 215 N.C. 15, 18 (1939). We assess whether a general plan for the development or improvement of the various lots exists by determining "whether substantially common restrictions apply

to all lots of like character or [which are] similarly situated." *Sedberry*, 232 N.C. at 711.

When Plaintiffs purchased the Plaintiffs' Tract from the Knights on 27 August 2021, no other portion of the Knights' property had been conveyed to any other purchaser. The Knights included restrictions in Plaintiffs' deed but retained the surrounding property as unrestricted until later conveying a portion to Defendants. The unsold, unrestricted remainder still belongs to the Knights. Plaintiffs cannot show that the Knights prearranged a general plan of uniform development with intent to improve the land. Additionally, the Plaintiffs' Plat, which served as Plaintiff's property description in their deed, does not include a neighborhood map which could indicate the Knights' intention of establishing a common plan or scheme of development. Plaintiffs did not purchase their property with any notice of multiple lots on a single plat or any plan to subdivide the Knights' property surrounding their tract. *See Rice v. Coholan*, 205 N.C. App. 103, 113–14 (2010) (holding that general plan of development existed where 14 of 18 total lots in a subdivision "contained the same or similar restrictions" despite "deeds to four lots [not being] similarly restricted" because "the properties were sold in accordance with a map"). With respect to Plaintiffs' conveyance, the unrestricted remainder precludes any "mutuality of restrictions." *Sedberry*, 232 N.C. at 711. Plaintiffs' argument that similar restrictive covenants exist on "at least five of the home and/or lots . . . in the immediate vicinity

of" the parties' tracts is irrelevant and unavailing, as these properties were never part of the Knights' Property and their restrictions are immaterial to our analysis.

Plaintiffs mistakenly invoke *Reed v. Elmore* to argue that the Knights' imposition of identical covenants on Plaintiffs' and Defendants' deeds shows intent to impose the restrictions on all subsequent properties conveyed. *See Reed*, 246 N.C. at 226 (concluding that plaintiff could enforce a covenant against defendant despite lack of express provision to that effect). In *Reed*, the original grantor produced a map subdividing her 154-acre tract into 7 lots. *Id.* at 222. The original grantor conveyed Lot 3 to plaintiff but retained Lot 4. The single instrument conveying Lot 3 included identical restrictions on Lot 3 and Lot 4. *Id.* at 223. Later, the defendants purchased Lot 4. *Id.* at 223. The *Reed* Court held that the plaintiff could enforce the restrictions against the defendants because the original grantor restricted Lot 4 at the time she conveyed Lot 3. *Id.* at 232. The Court "interpret[ed] the language which the parties chose to express [their] intention" at the time the sale to the plaintiff "was consummated." *Id.* at 224. It reasoned that "[t]he deed from [the original grantor] to plaintiff . . . uniform[ly] limit[ed] . . . the use of these two lots" and that the deed was in defendant's chain of title. *Id.* at 229–30. The Court also noted "the importance of imposing the restrictions on the grantor in the deed under which the grantee claims." *Id.* at 227. The deed's restrictions showed that the owner had purchased the land in reliance on an express restriction on the adjacent tract and "protected himself" by including it in the deed. *Id.* at 230. ("Being an interest in land, registration of the

instrument creating the right was necessary if the owner would protect himself against subsequent purchasers for value.").

Here, like the original grantor in *Reed*, the Knights retained all adjacent property after conveying the Plaintiffs' tract, including property they would later convey to Defendants. Unlike the restrictions in *Reed*, however, the restrictions on Defendants' property go unmentioned in Plaintiffs' deed. When conveying the property to Plaintiffs, the Knights did not insert simultaneous restrictions on the property later conveyed to Defendants. Plaintiffs purchased their lot from the Knights on 27 August 2021 without any restrictions on any adjacent Knight property at all, much less any against which Plaintiffs could claim enforcement rights. Unlike the parties in *Reed*, Plaintiffs did not "protect" themselves from future happenings on adjacent property at the time of conveyance. In theory, the Knights could have kept the retained land unrestricted in perpetuity.

Additionally, unlike *Reed*'s original grantor, Plaintiffs show no evidence that the Knights divided the lots as a common scheme of development. The Knights never recorded a survey plat showing any original purpose of development. Plaintiffs instead reference a survey plat prepared only by Defendants eight months after Plaintiffs' purchase. The evidence does not support Plaintiffs' assertion that the Knights and Defendants intended Plaintiffs to have any right to enforce Defendants' covenants as part of a common scheme of development. Thus, Plaintiffs have failed to show that they may enforce the covenants as equitable servitudes.

Based on these considerations, Plaintiffs lack standing to enforce Defendants' covenants as either covenants at law or equitable servitudes. Therefore, this Court finds no jurisdiction to hear Plaintiffs' claims and holds that the trial court erred by granting their motions for preliminary injunction and summary judgment. Because we find Plaintiffs' lack of standing dispositive, we need not address whether Defendants' conduct violates the restrictive covenant.

### III.    Conclusion

For the reasons discussed above, this Court dissolves the preliminary injunction and vacates the trial court's judgment for lack of jurisdiction.

VACATED.

Judges ARROWOOD and GORE concur.